[Crim. No. 774. Fourth Dist. Oct. 28, 1952.]

THE PEOPLE, Respondent, v. EMERY COLLIER, Appellant.

862

Richard L. Rykoff for Appellant.

Edmund G. Brown, Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Respondent.

BARNARD, P. J.—The defendant was charged in Count I with the crime of rape; in Count II with assault with intent to commit rape; in Count III with rape; in Count IV with assault with intent to commit rape;.and in Count V with assault by means of force likely to produce great bodily injury. The charges involve four different women, the fourth and fifth counts being different charges in connection with the same incident. The jury found him guilty on the first four counts and made no finding on the fifth count, which was then dismissed. This appeal is from the judgment and from an order denying a new trial.

These four incidents all occurred within a few blocks of each other in the Frontier Housing Project in San Diego, in which project the appellant had lived for several years. No attempt was or is made to challenge the testimony of the victims, except as to their identification of the appellant. At the trial each of the women positively identified the appellant as her assailant, giving good reasons therefor, and in each instance her testimony was not shaken by an extensive and able cross-examination. Each of them had previously picked out the appellant's picture from seven different photographs shown them by an officer, and had later picked him from a police line-up of four men. Each recognized his voice, in addition to other means of identification. None of them had previously known any of the others, and each made the previous identifications independently and without suggestion.

The woman involved in the first count was married and the mother of two children. On her way home on October 23, 1951, between 6 and 6:30 p.m. she was walking uphill on Leland Street, which at one point passes along the edge of a canyon. Halfway up the hill she met a man who grabbed her and threatened to cut off her head if she hollered. He had a knife in his hand and dragged her down into the canyon, where he raped her.

The appellant testified that he particularly recalled that on October 23, he took a Mrs. Fowler to choir practice at her church, in accordance with his usual custom; that he left home about 6:45 or 6:50 p. m., and picked up Mrs. Fowler where she worked at about 7:15; that he left her at about 7:45 and returned to his home, arriving there at 8:30; and that he did not leave the house after that. He was confronted with a police record showing that on October 23 he arrived at the police station at 7:50 p. m., where he paid a fine for a traffic violation. After being shown this record he said that when he got home he was told that an officer had left word for him to come to the police station, which he did. He then admitted that if he had taken Mrs. Fowler as he said, and then gone to his home, he could not have arrived at the police station before 9 p. m. He then admitted that he did not remember anything that happened on October 23, saying that all he had meant to say was that if it was a Tuesday or Wednesday it was one of those days on which he took Mrs. Fowler to church. Mrs. Fowler's testimony in this connection threw further doubt upon appellant's alibi. There was also evidence that one could drive from near where this

attack occurred to the place where Mrs. Fowler was employed in 12 minutes.

The woman involved in the second count was married and the mother of two children. On November 21, 1951, about 7 p. m., she was standing in front of a school waiting for a Cub Master to take her to a Cub Scout meeting. There were street lights some half block away in either direction. She saw a man coming under one of the street lights. When he approached he threatened her with a pistol, and told her if she screamed he would kill her. He pulled her into the school yard, threw her on the ground, and attempted to rape her. When she managed to scream, he ran through the school yard to another street. Two boys came to her assistance and saw the man running away.

The appellant testified that he did not recall the date of November 21, but said that if it was a Wednesday he took Mrs. Fowler to prayer meeting; that he customarily took her to prayer meetings on Wednesdays, following the same schedule as on Tuesdays. Mrs. Fowler testified that she had an understanding with the appellant for him to pick her up on Tuesdays and Wednesdays; that she worked until 7:30, but usually got away about 7:15 on those days; that she remembered riding with the appellant on the night of November 21; and that she went to prayer meeting. Later, she testified that all she remembered about November 21 was that the appellant took her to prayer meeting on Tuesdays and Wednesday nights, and that she did not have any idea what night of the week November 21 was.

The woman involved in the third count lived with her father and mother, and had never been married. She was walking up the Leland Street hill on her way home from work about 6:30 p. m. on December 15, 1951. About the same spot involved in Count I she was accosted by a man who grabbed her by both arms, face to face. He pushed her over the bank and into the canyon. He had a knife in his hand and threatened to cut her throat if she did not keep quiet. He threw her to the ground and raped her. She ran up the hill where she met an officer in a prowl car at 6:45 p. m. After a 10-minute search for the man, they returned to the canyon where the officer found her panties. In addition to the picture and the line-up, this woman was taken to the appellant's home on December 29, and identified him as her attacker.

The appellant testified that on December 15, he was at a friend's house from 5 p. m. to 2 a. m., playing poker with four men. He could not remember what he had done that day, where he came from when he went there, whether he went home for dinner, or whether he ate dinner at all. He said the same four had played poker on December 8, but he could not remember where they played or when they started. The testimony of the other card players revealed several uncertainties and variations as to times and dates. One man was sure of the date since he had broken his arm in November and "because most I go to the doctor every Monday morning." He could not identify any other Saturdays in connection with any other Monday visits to the doctor.

The woman involved in the fourth count was married and had children. About 6:15 p. m. on December 24, 1951, she walked up a little hill near Leland Street to look at the view. A man approached, grabbed her and threatened to cut her throat if she screamed. She screamed, and the man struck her several severe blows across the face and head. As she fell to the ground she saw him running away. She did not have a purse and the man did not ask for money. As she ran for home a neighbor came to her assistance. She was admitted to the hospital at 6:42 p. m. Her dress was badly torn and there were cuts on her ear, cheek and chin. Before she was given medical attention and her wounds stitched, the appellant was brought to the hospital, arriving at 7:08 p. m. When told that the officers wanted to bring a man in the woman objected violently. She was hysterical and very frightened, and screamed that she did not want to see anyone. The nurse covered her face except for one eye and the appellant was brought in. When asked if this was the man who attacked her she shook her head and said "No." At the trial she testified that at that time she did not recognize him and to her he was just a man.

The appellant testified that on December 24, he left downtown San Diego shortly after 6 p. m., having picked up two sailors; that he drove out Pacific Highway and Midway on his way home; that when he turned off Midway at Fordham he stopped to let them out; that they then said they would ride over to Frontier Street; that after going two blocks they stopped him and held him up; that this was between 6:30 and 7 p. m.; that one of the sailors held a knife on him while the other took $29 from his pocket; that when he tried to hit one of them the other struck him with the knife, cutting

his thumb; that his thumb bled on the pavement and the sailors ran off; that he drove home with his left hand, holding his right hand up; that on the way he met Paul Dunn who followed him home; that he got home about 6:45 p. m. and told his wife to call the police; and that the police arrived shortly thereafter and took him to the hospital.

The appellant made several conflicting statements about this robbery. Among other things, he first said the sailors had taken $9.00, later changed this to $29, and $12 was found on him when he was taken in. The next morning he and an officer visited the scene of the alleged attack. When no sign of blood was found, he claimed it had rained that night. Later that day the officer found many blood marks near where the woman had been attacked the night before. There was a deep cut crossways on the appellant's thumb, which did not jibe with his story of how the sailor had cut him. The scene of the claimed robbery was a heavily traveled street a short distance from Midway, a main highway. Paul Dunn and another friend of the appellant contradicted him in several respects. From the entire evidence in this connection, an inference may fairly be drawn that the robbery story was invented for the purpose of explaining the cut received in a struggle with this woman.

The appellant first contends that the evidence, with respect to his identification, is so improbable and incredible that it must be held insufficient to support the verdict. It is argued that none of the victims could have seen her assailant well enough to identify him; that each attack occurred some two hours after sunset; that the observation of each victim would be affected by her nerve-racking experience; that the identifications were prepared for by showing the victims photographs prior to a police line-up; that in two cases considerable time had elapsed; and that one of the women did not recognize him at the hospital shortly after the incident occurred.

Ample reason for the latter fact appears, and the matter was thoroughly covered in the evidence. The argument that practically nothing could be seen by the victims is contrary to common knowledge and experience. Naturally, these events did not take place immediately under street lights, but there were many street lights and lighted houses throughout that area, and many business places with strong illumination not far away. The officer who checked the scene, about 10 minutes after one of the crimes occurred, testified that while

there he did not have to use a flashlight in order to recognize another person, and that ''There is quite a bit of sign glow there from the numerous establishments on Midway Drive.'' Each of the victims testified that she could see her attacker and each was positive in her identification. The question was entirely one of fact and in each instance the evidence is amply sufficient to support the testimony here questioned.

Any claimed inconsistencies and contradictions were called to the attention of the jury and may not be here accepted as controlling. (*People* v. *Thomas*, 103 Cal.App.2d 669 [229 P.2d 836] ; *People* v. *Alexander*, 92 Cal.App.2d 230 [206 P.2d 657] ; *People* v. *Kittrelle*, 102 Cal.App.2d 149 [227 P.2d 38] ; *People* v. *Deal*, 42 Cal.App.2d 33 [108 P.2d 103].) It may be also observed that the matter of identification was strengthened by the nature of the alibi evidence.

It is next contended that the evidence is insufficient to sustain the verdict of guilty on Count IV. It is argued that while it shows violence it is insufficient to show an intent to commit rape. The victim who was struck severely and knocked down was not asked for money. The circumstances were such as to justify an inference that an act of rape was intended, and that her assailant desisted when in the struggle he cut his own thumb. While the evidence is somewhat meager, we think it is sufficient. (*People* v. *Nye*, 38 Cal.2d 34 [237 P.2d 1].)

It is next contended that the appellant was deprived of due process of law by being tried on all five counts at one time. It is argued that the evidence as to identification was so slight that none of the charges would have stood up had it been tried alone, and that this is indicated by the fact that the jury convicted him under Count IV instead of Count V. This fact does not so indicate, and the identification evidence was far from slight. The offenses were of the same nature, they occurred in the same general area about the same time of day, and in each instance physical force and a weapon were used. In one case this appears inferentially, from the cuts received. These counts were properly joined. (*People* v. *Kramer*, 103 Cal.App.2d 35 [299 P.2d 53] ; *People* v. *Walker*, 112 Cal.App.2d 462 [246 P.2d 1009].) Moreover, no objection to consolidation of the counts, or motion for a separate trial, appears in the record. (*People* v. *Van De Wouwer*, 91 Cal.App.2d 633 [205 P.2d 693].)

It is next contended that the court made inconsistent statements with respect to the fourth and fifth counts, and

in effect told the jury it must find the appellant guilty on Count IV. In his closing argument the district attorney had suggested a verdict of guilty on the fourth count and one of not guilty on the fifth count, since they both arose out of the same incident. In explaining the different forms of verdict submitted, the judge stated that while he was in accord with the statement of the law as to this matter, he would prefer that the jury follow a different procedure than that indicated by the district attorney. He then suggested that when the jury came to those counts it consider them and arrive at a verdict on one or the other, and leave the other blank. No suggestion was made that the appellant be found guilty on any count, and no inconsistency or reversible error appears.

The appellant claims prejudice in the failure of the court to give a cautionary instruction, although one was proposed by each side, and cites *People* v. *Lucas,* 16 Cal.2d 178 [105 P.2d 102, 130 A.L.R. 1485] and *People* v. *Putnam,* 20 Cal.2d 885 [129 P.2d 367]. These cases, and many others, hold that such an instruction should be given in such cases, but that the question of whether or not a failure to do so is prejudicial must depend on the circumstances of each case. In the Lucas case the judgment was affirmed, it being held that the circumstances were not such as to require a reversal. The Putnam case was reversed because, in view of the nature of the evidence, it was doubtful whether the same verdict would have been reached if the instruction had been given.

While we think this instruction should have been given, the failure to do so cannot be held to be reversible error in view of the evidence and the other instructions which here appear. The principles applied in the Lucas case are controlling here. Moreover, the main reasons for the rule relied on are less persuasive here. The factual background was conceded; the parties had not known each other, and there was not the usual ''opportunity for the free play of malice and private vengeance''; and any difficulty of proof related solely to the matter of identification, being no greater than that involved in cases of other types.

The appellant complains of several instructions, which require no extended consideration. The jury was told that it must consider this case ''without regard to sympathy, prejudice or passion for or against either party.'' The objection that the complaining witnesses were not parties to the action is more technical than substantial. The jury was told

that evidence of oral admissions of a party should be viewed with caution. The objection is that none were made. There was one statement which might have been so considered, and no prejudice appears. ▪ The jury was told that a witness false in one part of his testimony is to be distrusted in others. The objection is that the court failed to explain that any such falsity must be as to a material fact and willful. No other instruction was asked for. Complaint is made that an instruction as to the degree of proof necessary to convict was too long, complicated and confusing. The objection is without merit. ▪ Complaint is made of an instruction telling the jury that evidence of character is admissible because the law recognizes that a person of good character would probably not commit such a crime, and that such evidence should be considered with the other evidence in determining whether the evidence shows guilt beyond a reasonable doubt. The objection is that the court did not tell the jury that good character may *create* a reasonable doubt. The instruction was sufficient. (*People* v. *Navarette,* 21 Cal.App.2d 598 [69 P.2d 449].) The jury was told that it was not bound to decide the case because of a greater number of witnesses, which did not convince them, as against a lesser number. The objection seems to be that the appellant produced more witnesses, and is without merit.

It is further contended that the court erred in failing to instruct the jury with respect to "the evidence necessary for conviction under the separate counts"; in failing to instruct that a juror should not vote guilty merely because the majority so voted; and in failing to instruct with respect to a lesser offense, simple assault, in connection with Counts IV and V. ▪ The first two of these matters were adequately covered by other instructions. ▪ The last one was not required by the evidence, and no such instruction was asked for. We find nothing in the instructions given or refused which deprived the appellant of any substantial right.

▪ It is next contended that the court erred in excluding evidence of "experiments to determine possibility of physical identification." An offer of proof was made as to what an investigator was able to see on the afternoon of a clear day with the sun shining, while standing where the woman involved in the second count stood, and looking toward the street light where she first saw the man approaching. Evidence was offered as to the same experiment conducted

at 8 p.m. on March 24, 1952. The conditions of time, persons and many other factors were entirely different. The essential question of similarity rested in the discretion of the trial court. (*McGough* v. *Hendrickson,* 58 Cal.App.2d 60 [136 P.2d 110].) This whole matter was largely immaterial, since the real question involved was what this woman was able to see after the man came face to face with her, and while she was struggling with him. No reversible error appears in this connection.

It is next contended that the court erred in refusing to admit expert testimony "on the subject of the relationship between emotional tendencies and ability to identify." Complaint is made of the refusal to permit a professor of psychology to testify as to the reliability of the observation made by the victims under the circumstances shown by the evidence here. In a hypothetical question the professor was asked to give his views "relative to the reliability of the observation of this young lady under the circumstances as described." Counsel stated that this was offered for the purpose of showing the jury "the high possibility of error in eye identification." An offer of proof was made on the ground that "an individual under emotional stress would be less likely than at other times to make correct observations." The evidence was rejected on the grounds that this was a matter within the province of the jury, and that the proffered evidence was not within a proper field for expert testimony. We think this ruling was correct. The matter was one within the field of common knowledge and experience, and the effect of such emotional strain was one of the things which should be, and was, argued to the jury. No substantial right of the appellant was prejudiced by the exclusion of this evidence.

It is next contended that the police procedure, in connection with the identification of the appellant, constituted a denial of due process of law. It is admitted that no one act invaded his rights, but it is argued that the entire procedure had that effect. The objection is that the seven photographs shown to the victims had identifying numbers indicating that these individuals had previously run afoul of the law; that one of the victims was taken to view the appellant prior to the police line-up; that there was too much dissimilarity physically between the appellant and the other three men in the line-up; and that one of the officers had a preconceived idea that the appellant was guilty, as shown by his investigation

of the case and his testimony at the trial. Several statements made in this regard are contrary to the facts shown by the record. The photographs and pictures of the four different line-ups are in evidence and they furnish the best answer to most of these contentions. All of these matters were thoroughly gone into and presented to the jury, and no denial of due process appears.

The next contention is that the court erred in denying a motion for a new trial, based on three grounds. The first two, claiming error in rejecting the evidence of the psychology professor, and in rejecting the evidence as to "visual" experiments, have already been considered. The third ground was that of newly discovered evidence. This involved two alleged facts. One of them, if true, was known by the appellant prior to the trial. The other, relating to the victim in the third count, was not only hearsay but was stated to have been given to counsel over the telephone from an unidentified source. No attempt was made to show that any definite evidence was available. The showing was insufficient (*People* v. *English,* 68 Cal.App.2d 670 [157 P.2d 429]; *People* v. *Merrill,* 104 Cal.App.2d 257 [231 P.2d 573]), and no prejudicial error appears.

The final contention is that a review of the evidence, with the cumulative effect of the errors claimed, must lead to the conclusion that there was a miscarriage of justice. We have read the entire record and find nothing which justifies the conclusion that a miscarriage of justice has occurred.

The judgment and order are affirmed.

Griffin, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied November 25, 1952.