[Crim. No. 2517. Third Dist. June 22, 1954.]

THE PEOPLE, Respondent, v. ROBERT J. MEAD, Appellant.

Burke & Rawles, Newell Rawles, John E. Nelson and Arguello & Giometti for Appellant.

Edmund G. Brown, Attorney General, Doris H. Maier and Frederick G. Girard, Deputy Attorneys General, for Respondent.

SCHOTTKY, J.—Appellant was charged with the crime of manslaughter as defined in section 192 of the Penal Code, it being alleged in the information that "on or about the 21st day of June, 1953, in the County of Mendocino, State of California, said defendant did then and there, unlawfully, feloniously and without malice, kill two human beings, to wit, Vernon Newbury and Evelyn Laura Cass Newbury, in the driving of a vehicle in the commission of an unlawful act not amounting to felony with gross negligence." He was found guilty by the jury of the offense charged "without gross negligence," his motion for a new trial was denied, judgment was pronounced, and this appeal is from the judgment of conviction and from the order denying appellant's motion for a new trial.

Appellant urges a number of grounds for a reversal of

the judgment and order, the principal contention being that
the evidence is insufficient to support the judgment. Before
discussing these contentions we deem it appropriate to quote
the following language of our Supreme Court in *People* v.
*Newland,* 15 Cal.2d 678, 681 [104 P.2d 778]:

"The court on appeal 'will not attempt to determine the
weight of the evidence, but will decide only whether upon
the face of the evidence it can be held that sufficient facts
could not have been found by the jury to warrant the in-
ference of guilt. For it is the function of the jury in the
first instance, and of the trial court after verdict, to deter-
mine what facts are established by the evidence, and before
the verdict of the jury, which has been approved by the trial
court, can be set aside on appeal upon the ground' of insuf-
ficiency of the evidence, 'it must be made clearly to appear
that upon no hypothesis whatever is there sufficient sub-
stantial evidence to support the conclusion reached in the
court below. The determination of a charge in a criminal
case involves proof of two distinct propositions: First, that
the offense charged was committed, and second, that it was
perpetrated by the person or persons accused thereof. . . .
We must assume in favor of the verdict the existence of every
fact which the jury could have reasonably deduced from
the evidence, and then determine whether such facts are suf-
ficient to support the verdict.' If the circumstances reason-
ably justify the verdict of the jury, the opinion of the
reviewing court that those circumstances might also reason-
ably be reconciled with the innocence of the defendant will
not warrant interference with the determination of the jury.
[Citing cases.]"

Bearing in mind the rule just quoted we shall summarize
the evidence as shown by the record.

On June 21, 1953, Vernon Newberry and his wife, Evelyn
Newberry, were killed as a result of an automobile accident.
The accident occurred at approximately 4:30 p. m., about
16 to 18 miles south of Ukiah, on U.S. Highway No. 101. The
only vehicle involved was a taxicab in which the Newberrys
and appellant were riding. There were no eyewitnesses to
the accident, but the cab had crossed over the center line of
the highway and crashed into a bank on the left side. When
a state highway patrolman arrived, shortly after the accident,
there were quite a few people there; the Newberrys were in
the front seat of the cab and appellant was lying on the
ground approximately 15 feet away. Appellant's testimony

established that he was engaged in the taxicab business in Ukiah; that the Newberrys had engaged him to take them by cab from Ukiah to Santa Rosa and had paid him $25 for the service; that they were en route to this destination when the accident occurred; and that he was driving the cab. Appellant, too, was injured in the accident; he had a circular bruise, 16 to 18 inches in diameter, on his chest, which might have been caused by his having been thrown against the steering wheel.

At the place where the accident occurred, the paved portion of the highway was 36 feet wide; there were two lanes for traffic and the center line was painted white. On the east side of the pavement (this being the left-hand side with respect to the cab which was proceeding south) there was a gravel shoulder about 6 to 8 feet in width. There was no intersection at this point, and no road repairs were being made there. The cab ran into the bank at an angle of west to east, in a southerly direction, which might be taken to indicate that it did not make an abrupt left turn into the bank. There were no skid marks on the highway. Appellant testified that he was driving at a normal speed (50 to 55 miles per hour) when "the car just suddenly cut across the road and hit the bank," and that he could not account for it unless something had happened to the steering apparatus. He stated that he saw "the bank coming" and the next thing he knew he was lying on top of the steering wheel. He also testified that just before the accident he did not feel abnormal in any way, so far as his physical condition was concerned. Appellant was an uncontrolled diabetic, and there is evidence that diabetics sometimes lapse into a diabetic coma. No evidence was introduced to show any mechanical defect in the cab.

There is testimony by eyewitnesses that appellant drank at least three bottles of beer prior to the accident on that day, and appellant admitted that he had consumed a bottle and a half of beer. A specimen of appellant's blood was taken some time between 5 and 6 o'clock that evening, while he was in the hospital, and it showed an alcoholic content of 3.5 milligrams "per c.c." There is medical testimony showing that 1.5 milligrams of alcohol is generally taken as the dividing line between sobriety and drunkenness, and that a person with 3.5 milligrams of alcohol in his blood should be highly intoxicated. One medical doctor testified that in order to reach the 3.5 milligram level, a person (drink-

ing beer) normally would have to consume 15.2 bottles of beer having an alcoholic content of 5 per cent. This same doctor indicated in his testimony that the degree of intoxication would not be affected by the presence of diabetes. Appellant was kept in the hospital for several days, and a second blood specimen was taken about 39 hours after the first one. This second specimen showed an alcoholic content of one-tenth of a milligram. One doctor testified that the normal person will usually diminish his blood level of alcohol at the rate of one-tenth milligram per hour.

There was medical testimony that a person having a 3.5 level of blood alcohol would have difficulty in walking and talking, and would appear to be sluggish mentally. He would fall asleep easily. One prosecution witness, who saw appellant shortly before the accident and who had had three bottles of beer himself, testified that appellant's "face was kind of red and kind of flushed and kind of sleepy," but that appellant did not appear to be drunk. Another witness testified that appellant looked like he had been drinking, but in effect admitted that it might have been a hangover. However, a state highway patrolman testified that he smelled the odor of intoxicating liquor near appellant at the scene of the accident, although he did not know whether it was on appellant's breath, and the assistant ambulance driver testified that he could smell stale beer when he was near appellant. A doctor, who attended appellant at the scene of the accident and administered 2 c.c.'s of Demerol to him, testified that he saw no evidence that appellant was under the influence of intoxicating liquor at that time. And another doctor who examined appellant at the hospital before the blood specimen was taken testified that he had no reason to think that appellant was "deeply intoxicated." This last witness also testified that appellant was in shock at the time, and there is other medical testimony in the record that shock and attendant pain may stimulate a person and tend to keep him awake, although it does not get rid of the alcohol.

Regarding the cause of the accident, the highway patrolman who testified to the odor of intoxicants near appellant also testified that at the scene of the accident appellant was asked how it happened, and appellant replied "I must have dozed." This same officer testified further that on the following day he visited appellant at the hospital and asked him what caused the accident, and that appellant replied "I must have dozed or went to sleep."

We find no merit in appellant's contention that the evidence is insufficient to support the judgment of conviction. Appellant was charged with having caused the death of Mr. and Mrs. Newberry "in the driving of a vehicle in the commission of an unlawful act not amounting to a felony."

■■ If appellant was driving the cab while under the influence of intoxicating liquor, such driving constituted an unlawful act not amounting to a felony. (Veh. Code, § 502.) He need not be drunk or intoxicated in order to be under the influence of intoxicating liquor; it is sufficient if such liquor has so far affected his nervous system, brain, or muscles, as to impair to an appreciable degree his ability to operate the cab in a manner like that of an ordinarily prudent and cautious person in the full possession of his faculties, using reasonable care and under like conditions. (*People* v. *Haeussler,* 41 Cal.2d 252, 261 [260 P.2d 8].) ■ Applying the rule of *People* v. *Newland, supra,* appellant's admission that he had drunk some beer prior to the trip, his explanation that he must have dozed or fallen asleep, the circumstances surrounding the accident (there was no evidence of mechanical failure), the odor of alcohol about him, the blood analysis showing a high alcoholic content, and the medical testimony evaluating the blood analysis, all support the jury's implied finding that appellant was under the influence of intoxicants, if not intoxicated, when the accident occurred. The fact that there was considerable evidence tending to show that appellant was not under the influence of intoxicating liquor at the time of the accident only served to create a conflict in the evidence.

■ Appellant next contends that the district attorney committed prejudical misconduct in offering hearsay testimony of Mrs. Sadie Thurston that Dr. Vest had told appellant that he was a murderer on the highway.

Appellant states in his brief:

"Mrs. Sadie Thurston testified over objection as to a conversation between Dr. Vest and the defendant as follows: 'Dr. Vest asked Mr. Mead how he was injured and where he was injured when he examined him and asked him if he had been drinking and Mr. Mead said he had a little beer. And the doctor made some remarks to the effect that he was murder on the highway.' (Rep. Tr. Vol. 2, p. 360, lines 12 to 16.) These remarks were stricken by the Court. (Rep. Tr. Vol. 2, p. 360, lines 9 to 12.) Thereafter the District Attorney, Mr. James E. Busch, argued in the presence of the jury and reiterated the phraseology 'You are a murderer on the high-

ways' quoting that. (Rep. Tr. Vol. 2, p. 360, lines 13 to 18.) Nevertheless, the Court ordered the matter stricken. After the close of the defense case, Mr. Busch reintroduced Mrs. Thurston to testify that Dr. Vest had said that Mr. Mead was a murderer on the highway. (Rep. Tr. Vol. 3, p. 545, lines 1 and 2.) Because the witness could not remember whether or not a response was or was not made, the evidence was thereafter stricken. (Rep. Tr. Vol. 3, p. 553, line 13.)

"That this was highly inflammatory and prejudicial testimony, there can be no doubt. It is therefore respectfully submitted that the action of the District Attorney in bringing in twice before the attention of the jury such testimony was prejudicial misconduct, that the motion of the defense for a mistrial at that stage of the proceedings should properly have been granted."

In reply respondent points out that Mrs. Thurston was the nurse who attended appellant upon his admission to the hospital and Dr. Vest was the attending physician; that Mrs. Thurston was asked if she had heard a conversation between Dr. Vest and appellant and that she gave the answer above stated. The court ordered the language "The Doctor made some remark to the effect that he was a murderer on the highway" stricken, and the district attorney then stated to the court that he intended to show an implied admission by appellant, stating: "Dr. Vest said 'You are a murderer upon the highways' and I seek to prove by this witness that he did not deny that, that he did not answer that accusation." The court refused to change the ruling.

On cross-examination of Mrs. Thurston by appellant, it was established that she had not informed the district attorney's office of the conversation between Dr. Vest and appellant until after her first testimony on October 28, 1953. Moreover, it was brought out on cross-examination of Mrs. Thurston that appellant appeared to be rational at the time the accusation was made.

In an argument addressed solely to the court (the jury having been excused), the district attorney argued that this evidence was admissible as an implied admission. The court stated the evidence was denied admission because the prosecution was taking inconsistent positions, i.e., arguing on one hand appellant was drunk and then relying on an implied admission which requires an understanding of the nature of the communicated accusation.

In the presentation of his defense appellant attempted to

show, through his own testimony and that of the physician who attended him at the scene of the accident, that he was rational although suffering pain. In rebuttal, the prosecution again called Mrs. Thurston, and on direct examination she testified as follows:

"A. Well, Dr. Vest then made the remark sometime through the conversation that Mr. Mead was a murderer on the highway.

"Q. And did Mr. Mead deny that or say anything in reply?
A. I don't remember Mr. Mead making any remark.

"Q. As far as you remember, he said nothing, is that right?
A. To the best of my memory. I can't remember."

On cross-examination and recross-examination, Mrs. Thurston testified she had not discussed the related conversation with the district attorney personally and that her only contact with his office subsequent to the date of the trial was on October 29, 1953, when she first advised a prosecution investigator of the conversation.

On recross-examination Mrs. Thurston testified that she did not remember whether appellant answered at all.

A motion to strike the testimony with respect to the statement of the doctor made in the witnesses' presence was then made and granted. The appellant then requested a mistrial, stating that the district attorney knowingly, after discussing the matter with the witness, introduced the testimony for the sole purpose of inflaming the jury prejudicially against the appellant. The court denied the motion for mistrial and strongly admonished the jury to disregard the testimony concerning the conversation between Dr. Vest and appellant.

We are unable to agree with appellant that the district attorney was guilty of prejudicial misconduct. The record shows testimony by Mrs. Thurston that she had never discussed the matter personally with the district attorney and that she had discussed it only on one occasion with an investigator from the district attorney's office. On two occasions the district attorney made full and adequate offers of proof. Moreover, Mrs. Thurston's testimony indicated an opportunity to hear any replies. On the witness stand she had stated she had heard a conversation between appellant and Dr. Vest. Moreover, she answered questions directed to her recollection of appellant's reply to the accusation in the following terms: "I don't remember Mr. Mead making any remark," and to the question "He said nothing, is that right?" she replied, "To the best of my memory. I can't remember."

The record shows appellant did not object to this testimony

when given. It was only on recross-examination that the first hint that Mrs. Thurston's testimony was inadmissible on the ground that she did not remember whether appellant replied to the accusation, appeared.

There is nothing to indicate bad faith on the part of the district attorney, as he was fully justified in believing that Mrs. Thurston's testimony was admissible as an implied admission, and the trial court would have been fully justified in refusing to strike it. For as stated in *People* v. *Yeager,* 194 Cal. 452, at page 486 [229 P. 40]:

"The admission of such evidence is an exception to the hearsay rule. Evidence of conduct is receivable if it tends to show a consciousness of guilt or intent—such as flight, concealment, preparation, or other acts or declarations inconsistent with the theory of innocence (8 Cal.Jur., sec. 157, p. 42). Such evidence is not admissible for the purpose of proving the truth of the accusatory statements, but rather as indicating a consciousness of guilt on the part of the accused by allowing an imputation opposed to the presumption of innocence to pass unchallenged. It is for the court in the first instance to determine whether the import of the statements is such that it would furnish a foundation for proof of conduct, and it is then for the jury to decide whether the accused was aware the statements were made, whether, under all the circumstances shown, they called for a disclaimer, whether the accused did reply to them, and whether if he did not do so, such failure showed criminal intent or a consciousness of guilt. If these propositions of fact are resolved in favor of the prosecution the item of conduct should be given the effect to which upon the entire case it is entitled."

 Appellant's next contention is that the district attorney committed prejudicial error in his argument to the jury. In his closing argument to the jury, the district attorney stated that appellant was transporting passengers for hire and that he certainly had a greater obligation to see that they were safely transported than, say, two friends who go out on a joint venture and get intoxicated. Appellant's counsel objected immediately, stating that the district attorney's statement was a misstatement of the law, to which the trial court replied:

"Well, the jury will take the law from the Court. And counsel are arguing their case as they see it. If there is any difference between what they argue to be the law and

what the Court instructs you is the law, you will, of course, take the law from the Court."

The district attorney again told the jury that a person operating a vehicle for hire has a great obligation to see that he transports them safely, and counsel for appellant cited these remarks as prejudicial misconduct.

■ Appellant, as a carrier of passengers for hire, owed to the Newberrys the utmost care and diligence for their safety. (*Sipperly* v. *San Diego Yellow Cabs, Inc.*, 89 Cal.App. 2d 645, 649 [201 P.2d 543].) ■ The manslaughter charge, as set out in the information, involved the element of gross negligence. ■ The term "gross negligence," as used in section 192 of the Penal Code, has been defined as the want of slight care, or the exercise of so slight a degree of care as to justify the belief that there was an indifference to the things and welfare of others, or that want of care which would raise a presumption of the conscious indifference to consequences. (*People* v. *Costa,* 40 Cal.2d 160, 166 [252 P.2d 1].) Appellant's actions, as related to the surrounding circumstances, may be considered in determining his state of mind, i.e., whether he was indifferent to the consequences. (*People* v. *Costa, supra.*) ■ Respondent contends that the district attorney's remarks were directed to the issue of gross negligence, and that no harm was done, in any event, for the jury found that appellant was not grossly negligent. Appellant has not shown in what way he was prejudiced by the alleged error, and injury will not be presumed. (Const., art. VI, § 4½; *People* v. *Baskins,* 72 Cal.App.2d 728, 733 [165 P.2d 510].)

■ Appellant contends also that the court erred in refusing to give the following instruction offered by him:

"I further instruct you as follows: Where a person commits an act without being conscious thereof, such act is not criminal even though if committed by a person who was conscious it would be a crime.

"When the evidence shows that the Defendant act*ing* as if he was conscious the law presumes that he then was conscious. This presumption, however, is disputable, and may be overcome or questioned by evidence to the contrary, and, if you should find that the Defendant committed an act which, if he was conscious, would constitute the crime charged against him, or be an element of that crime, and if you should not be convinced beyond a reasonable doubt that he then was conscious, you shall find that he then was unconscious, and return a verdict of not guilty."

Appellant argues that the evidence shows that he was an uncontrolled diabetic and, as such, was subject to periods of diabetic coma, and he complains that no instruction was given on this phase of the case. The proposed instruction was erroneous, in that it would have required an acquittal even though the jury found that appellant was rendered unconscious by his voluntary act in becoming intoxicated. Unconsciousness so caused is not a defense to a crime such as that charged here. (*People* v. *Anderson,* 87 Cal.App.2d 857, 860 [197 P.2d 839].) Further, appellant testified that he was conscious up to the moment of the impact. Instructions which state abstract rules of law not applicable to the case at bar, or which do not state the law accurately, are properly refused.

Appellant's next contention is that the trial court erred in denying his motion for a directed verdict, his argument being, in effect, that there was no proof of the corpus delicti independent of his own statements and admissions. This contention is likewise without merit. The rule applicable to this contention is aptly stated in *People* v. *Cullen,* 37 Cal.2d 614, 624-625 [234 P.2d 1], as follows:

"Here the corpus delicti consists of two elements, the death of the alleged victims and the existence of some criminal agency as the cause, either or both of which may be proved circumstantially or inferentially. [Citing cases.]

. . . . . . . . . . . . . .

"Proof of the corpus delicti does not require identity of the perpetrators. It is not necessary that it connect the defendant with the commission of the crime, although it may do so. . . .

"It is the settled rule, however, that the corpus delicti must be established independently of admission of the defendant. Conviction cannot be had on his extrajudicial admissions or confessions without proof *aliunde* of the corpus delicti; but full proof of the body of the crime, sufficient to convince the jury of its conclusive character, is not necessary before the admissions may be received. A prima facie showing that the alleged victims met death by a criminal agency is all that is required. The defendant's extrajudicial statements are then admissible, the order of proof being discretionary, and together with the prima facie showing must satisfy the jury beyond a reasonable doubt. [Citing cases.]"

The record shows that the only vehicle involved was a taxicab owned by appellant. At the scene of the accident

the Newberrys were found in the cab, fatally injured. Appellant was lying on the ground about 15 feet away, and he had a fresh circular bruise about 16 to 18 inches in diameter on his chest. The steering wheel of the cab was also about 16 to 18 inches in diameter, and one doctor who attended appellant testified that appellant had been injured by being thrown against the steering post. About an hour before the accident, appellant and the Newberrys stopped at a road house about two and one-half miles south of Ukiah and, while there, appellant stated that he was going to Santa Rosa and asked a friend if he would care to go along. The angle of impact indicates that the cab was proceeding in a southerly direction on the highway, that it crossed over the center line and proceeded for some undetermined distance along the left side of the highway before crashing into the bank at the left. There were no skid marks, no road repairs were in progress, and no evidence of mechanical failure was introduced. There was ample evidence that appellant was under the influence of intoxicants, if not highly intoxicated. The above evidence certainly makes a prima facie showing that appellant was operating the cab while intoxicated, and that two deaths resulted therefrom.

Equally without merit is appellant's final contention that the instructions given on the definition of manslaughter, driving while intoxicated, and proximate cause, when read together, deprived him of the defense that his act was not the proximate cause of the deaths. The record shows that the trial court gave the following instructions, among others:

''As applicable to this case, manslaughter is the unlawful killing of a human being without malice in the driving of a vehicle: (a) In the commission of an unlawful act not amounting to a felony with gross negligence; (b) in the commission of an unlawful act not amounting to a felony without gross negligence.

''To constitute the kind of manslaughter charged in this case, the death of the human being in question must be the proximate result of the commission of an unlawful act not amounting to a felony.

''I instruct you that the phrase 'under the influence of intoxicating liquor' does not mean that the driver must be drunk or intoxicated, but means that if intoxicating liquor has so far affected his nervous system, brain, or muscles, as to impair to an appreciable degree his ability to operate the vehicle in a manner like that of an ordinarily prudent and cautious man in the full possession of his faculties, using

reasonable care, and under like conditions, then such driver is under the influence of intoxicating liquor within the meaning of the statute.

"I instruct you that any person who drives an automobile upon a public highway while under the influence of intoxicating liquor is committing an unlawful act not amounting to a felony.

"Notice that I have heretofore indicated something to you about proximate cause. And I find that you should be informed as to what proximate cause means in order for you to be fully instructed upon the law of this case. And therefore I do instruct you that the proximate cause of an injury is that cause which in natural and continuous sequence unbroken by any efficient intervening cause produces the injury and without which the results would not have occurred. It is the efficient cause, the one that necessarily sets in operation the factors that accomplish the injury."

The instruction on manslaughter follows the language of the code provision. (Pen. Code, § 192.) If appellant desired a fuller definition, he should have presented a request therefor. (*People* v. *Cayer*, 102 Cal.App.2d 643, 652 [228 P.2d 70].) The instruction defining the phrase "under the influence of intoxicating liquor" is approved in *People* v. *Haeussler*, 41 Cal.2d 252, 261 [260 P.2d 8], and that covering the driving of an automobile while under the influence of intoxicating liquor finds support in section 502 of the Vehicle Code. The instruction as to proximate cause contains the standard definition of proximate cause and correctly states the rule.

We are convinced that the appellant was given a fair and impartial trial, that he was ably defended, that the jury was fully, fairly and correctly instructed, that no prejudicial errors were committed and that there was ample evidence to support the judgment of conviction.

The judgment and order are affirmed.

Van Dyke, P. J., and Peek, J., concurred.

A petition for a rehearing was denied July 2, 1954, and appellant's petition for a hearing by the Supreme Court was denied July 21, 1954.