[Crim. No. 7082. Second Dist., Div. One. Feb. 15, 1961.]

THE PEOPLE, Respondent, v. ANITA ROYE ROERMAN, Appellant.

Robert W. Driscoll for Appellant.

Stanley Mosk, Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Respondent.

LILLIE, J.—Defendant was charged by information with manslaughter in violation of section 192, subdivision 3(a), of the Penal Code (driving a vehicle in the commission of an unlawful act, not amounting to a felony, with gross negligence and while in the commission of a lawful act which might produce death, in an unlawful manner, and with gross negligence). In a trial by jury she was convicted of the offense charged, with gross negligence. A motion for a new trial was denied. Probation was granted. She has appealed from the judgment (order granting probation) and the order denying a new trial.

Abbie Gerrells, aged 73, died at the Memorial Hospital in Glendale on August 14, 1959. The cause of death was multiple pelvic fractures and lacerations of the liver due to crushing injuries of the hips and torso. About two hours prior to death she sustained the fatal injuries upon being struck by a car driven by defendant in a business district of that city. Viewed in the light most favorable to the People, the record discloses the following facts:

A clergyman, Reverend Paul Royer, was driving his car slowly and southerly on Brand Boulevard in Glendale around noon of August 14; he was looking for a place to park—there is diagonal parking on Brand Boulevard in that area. He observed an automobile backing out until its full length was outside the parking area; during this operation he heard its tires ''break and squeal''; he next observed the car start forward again, and he again heard the sound of tires spinning. According to the witness, the car ''was brought (back) into the parking area and went right on through,'' going over the curb and coming to rest against a wall dividing two stores. After the car came to a stop, he heard a woman cry from that direction, ''Help me; please help me.'' The back end of the car was continuously in the view of the witness as it went over the curb, and at no time did he see its stop light go on. After the car came to rest, the witness saw a woman get out of the driver's side. He did not notice any other person in the automobile.

Miss Constance Daigle testified that she was driving her car in a southerly direction on Brand in a lane adjacent to the parking area, ''and all of a sudden I saw a car just . . . It looked like it came out of nowhere, up over the curb . . . and pinned this woman against the side of the building.'' She noticed two men push the car back from the building. An

elderly woman who was "over the right front fender" fell to the ground.

Robert Kelly was walking on the west side of Brand. He heard a sound behind him which was similar to brakes squeaking. Looking in the direction of the sound, he observed a car about 30 feet away moving through the parking area toward the curb "at quite a speed." The car went over the curb, knocked down a parking meter, crossed the sidewalk and struck an elderly woman and a girl, pinning them against the wall. Mr. Kelly saw a woman get out of the driver's side of the car and walk away.

Louis Accornero was in the doorway of a store on Brand Boulevard when he heard two sounds of impact, first a light one and then a heavy one. Proceeding to the scene, he observed a woman and a girl pinned by a car against a wall. Mr. Accornero got into the car and released the hand brake which, he found, was in a pulled-out position. The witness noticed the driver of the automobile as she was opening the door and getting out.

Another witness, Robert Leffingwell, was in the doorway of a stationery store adjacent to the scene of the accident. He heard a loud crash and proceeded immediately to the scene. On approaching, he saw two persons pinned against a wall and calling for someone to move the car; the witness assisted in pushing the car back. Mr. Leffingwell identified the defendant as the driver of the car, stating that she was leaving the scene as he approached; the next time he saw her, she was in the company of a police officer leaving the stationery store, at which time he noticed that she had a heavy cast on her right leg.

Mrs. Lillian Doolittle, a saleslady in the stationery store, heard the crash and the cries of the injured persons. She came to the front of the store and observed the defendant get out of the car; the latter then went directly from the car into the store—Mrs. Doolittle noticed that defendant had a cast on her right leg. After arrival in the store, the witness applied cold towels to defendant's neck; the defendant inquired for, and was shown, the location of the telephone; defendant made a telephone call and Mrs. Doolittle wrote down a number given her by the defendant. At no time, in answer to a question by the district attorney, did defendant say anything to the witness about getting an ambulance for the injured persons outside.

Mrs. Romona Gisolo, a fellow employee of Mrs. Doolittle,

was in front of the store; she testified that defendant's car "looked as though it were coming into the window." She telephoned for an ambulance; while she was on the telephone, she observed the defendant walk past with Mrs. Doolittle and she described defendant's appearance as "very nervous"; also, there was blood on her lip and chin and possibly some on her forehead.

A Glendale police officer, Elmer Bolch, was stationed at a corner nearby when the accident occurred. He heard the squealing of tires on the pavement and saw the car in the process of striking a building. He ran to the scene and ascertained the extent of the injuries sustained by the victims and the name of the elderly lady (later deceased). The officer then ran into the stationery store to use the telephone; he saw the defendant at a desk in the rear holding a telephone receiver in her hand. In response to his inquiry, the defendant said that she was involved in the accident and that she was trying to call somebody; asked by the officer if she had called an ambulance, the defendant did not answer. An ambulance having been summoned, the officer left defendant in the company of Officer William Boggs to take defendant's statement. Subsequently measurements were taken by Officer Bolch of the width of the sidewalk, the height of the curb and the distance from a certain "island" (dividing the north and south bound traffic lanes on Brand) to the curbing on the west side of the thoroughfare.

Officer Boggs testified that he met Officer Bolch at the scene of the accident and then proceeded to the stationery store where he saw the defendant sitting at a desk—she appeared to be telephoning. In response to his inquiry, she stated that she was the driver of the vehicle involved; she also produced her operator's license after she had completed her telephone call. Asked by the officer about the accident, defendant stated that she had started to back out and that somebody had struck her car and knocked her back on the curb. The officer next saw defendant getting into the right front seat of the ambulance which took the victims to the hospital; subsequently he saw her outside the hospital while she was still seated in the ambulance. The officers took a statement which the defendant read and signed: In substance, she had parked at a certain location on Brand Boulevard at about 11:15 a. m. and had returned about 12:10 p. m.; that she backed out, heard a loud noise, and then her car lunged forward and jumped the curb, striking two pedestrians; that her right foot and ankle were in a cast

put on by a Dr. Balkin about July 27, 1959; that she had been driving (with the cast unremoved) since August 1st and had been sitting further to the right of the car in order to use her left foot for the gas and brakes.

Officer Rober Simon, summoned to the scene, checked the brake pedal and steering wheel of defendant's car; both were working. He also ascertained that the tires were in good condition.

A doctor on duty at the emergency hospital, Dr. David McAnich, testified to the injuries sustained by the two pedestrians. He recalled seeing the defendant being helped from the ambulance; her general condition appeared to be good, although she had a small laceration on her left chin; she made no complaints of dizziness or any symptoms due to injury, and seemed rather calm. The defendant indicated that she preferred to be treated by her own physician.

There was testimony from a qualified witness that the injuries sustained by Mrs. Gerrells caused her death—defendant does not dispute that fact.

Defendant took the stand. She testified that she broke her right foot about July 21, 1959; that the foot was placed in a walking cast; that she resumed driving about August 1st, after practicing a good deal in her driveway. Her automobile, a 1956 Plymouth, had automatic transmission with pushbutton drive; she operated the brake and gas pedals with her left foot —she claimed to have done so without difficulty while wearing the cast. Defendant was aware that the area of the accident was a very busy one from the standpoint of traffic. As to the accident itself, she was completing the backing out operation from the diagonal parking space and was about to proceed into the southerly traffic lane when there was a loud noise to her rear; she caught a glimpse of a car behind her. As a result she "instinctively started to go forward" again into the parking space; her car struck the curb as she slammed on the brakes, and her foot bounced off the brake pedal. Upon striking the curb, her face hit the steering wheel with a severe blow and her car "flew" across the sidewalk. She was "stunned" and "appalled"; somebody then helped her from the car.

Explanatory of her earlier testimony, defendant stated that she realized her car was going "a little faster than normal" when it was about half way into the parking space; she thought it would slow down, but she glanced ahead and saw the elderly woman on the sidewalk; at that moment she "caught" a little of the panic in the latter's face—"it panicked me to see her

so frightened." After the accident, she started to the aid of the victims but was prevented by the rush of people at the scene. She stated that she went to the stationery store to phone for an ambulance; upon hearing that one had been summoned, she made a telephone call to her husband and son; she denied stating in Mrs. Doolittle's presence that she was calling her insurance agent.

Defendant's testimony that there was a noise behind her car (as she was backing out) was corroborated by Mrs. Ruth Ayers, a pedestrian in the vicinity of the accident. Mrs. Ayers stated that the noise came from a car moving along Brand Boulevard a little faster than regular traffic; that this car came within 5 feet of defendant who, the witness thought, was looking over her shoulder in the direction of the moving car and appeared frightened.

A licensed medical doctor, Dr. Robert N. Brown, was called on behalf of the defense. The defendant consulted him on August 24th (10 days after the accident) and complained of headaches, stiffness and soreness in her neck and back; she had a large contusion and bruised area on her left chin. The defendant's mandibular nerve was damaged so that she could not smile on one side of her face; defendant was emotionally upset and, in the opinion of the witness, was going through the menopause. Shown a bent steering wheel from the defendant's car, the witness was of the opinion that the bending of the wheel was consistent with a rather severe force thereon and also consistent with his findings relative to the defendant's jaw and face. In Dr. Brown's opinion, the defendant had sustained a moderate concussion at the time of the accident and was "shaken up quite badly"; it was his further opinion that a person who had received the indicated blow to the chin, had then gotten out of her car and observed a scene of wild confusion, would not be able to respond in a normal way; more specifically, that such a person would not have the ability to comprehend what was going on around her. Dr. Brown also testified that there is complete separate control of the two feet—the right foot "may be on the blink, and the left would be working all right"; he added that there would not be any sympathetic difficulty with the left foot as a result of the cast on the right foot.

Albert I. Lissak, an amputee, was also called by the defense. It was stipulated that he was an expert on prosthetic devices, in the training of amputees, and on the ability of individuals

158

to use one limb where the other limb normally would be used but was incapacitated. According to Mr. Lissak, it ordinarily takes an otherwise normal, average amputee no more than five minutes to learn to drive competently with the left foot. He acknowledged he had not trained the defendant. Defendant offered to prove through this witness that under certain hypothetical facts the wearing of a cast on the right foot would not interfere with the operation of a motor vehicle by a person who had learned to drive with his left foot; the court sustained objections to this proffered testimony.

It is contended that there is insufficient evidence to support the judgment; that the court erred in instructing the jury and in ruling on the admissibility of evidence; that the conduct of the court and the district attorney was prejudicial; and that the court erroneously denied a motion to disqualify under section 170.6, Code of Civil Procedure.

Appellant argues that the determination of gross negligence or unlawfulness is not supported by the evidence, pointing to the fact that she had a cast on her leg and stressing partisan testimony favorable to the defense; she emphasizes that the law does not specifically prohibit the operation of motor vehicles by a one-legged person or, as in her case, a person without full freedom of one foot. ■■■ " 'Gross negligence has been repeatedly defined . . . as "the want of slight diligence," "an entire failure to exercise care, or the exercise of so slight a degree of care as to justify the belief that there was an indifference to the things and welfare of others," and "that want of care which would raise a presumption of the conscious indifference to consequences." ' (Cooper v. Kellogg, 2 Cal.2d 504, 510-511 [42 P.2d 59].)" (People v. Costa, 40 Cal.2d 160, 166 [252 P.2d 1].) Certain of the definitions above quoted are in the disjunctive; they were read to the jury, upon request of both sides, in the form of an instruction (CALJIC 342)[1] which is based on Cooper v. Kellogg, supra. As used in the Cooper case, as well as in the instruction which was given (f.n. 1), the word "or" refers to alternatives, that is, one or the other of two or several things or situations and not a combination of them (see generally People v. Smith, 44 Cal.2d 77, 78 [279 P.2d 33]; 67 C.J.S.

---

[1] "The term 'gross negligence' . . . means such a degree of negligence or carelessness as amounts to the want of slight diligence, *or* to an entire failure to exercise care, *or* to the exercise of so slight a degree of care as to justify the belief by the jury that there was an entire indifference to the property and persons of others, or the inference that there was a conscious indifference to consequences . . ." (Emphasis added.)

p. 515, f.n. 67 and 68), so that it is immaterial into which technical pigeonhole appellant's gross negligence fell. (65 C.J.S., "Negligence," p. 1236, f.n. 94, 95.) Although wearing a cast on her right foot, appellant proceeded to an area of the city which she admittedly knew to be a busy one from the standpoint of traffic; the jury could validly conclude that in view of her then physical condition she was unable properly to control her car at the time and place in question; thus, although on notice as she backed out (if only from the circumstance of her wheels spinning) that she had inadequate control of her automobile, appellant nevertheless continued to maneuver the car and in doing so drove it forward at such a speed that it jumped the curb and knocked over a parking meter. In *People* v. *Leitgeb,* 77 Cal.App.2d 764 [176 P.2d 384], involving a similar offense, the court declared: "It is a question of fact for the jury to determine whether conduct in a given situation evidences negligence and, if it does, whether it is gross, ordinary, or slight negligence. We could interfere with the finding of the jury only if we were convinced that freedom from gross negligence was so clearly established by the evidence that reasonable minds could not differ upon the question." (P. 769.) This is true "even where there is no conflict in the evidence if different conclusions upon the subject can be rationally drawn therefrom." (*Malone* v. *Clemow,* 111 Cal.App. 13, 18 [205 P. 70].) To the same effect is *People* v. *Markham,* 153 Cal.App.2d 260, 273 [314 P.2d 217], and numerous authorities therein cited. In the Leitgeb case, *supra,* as in the one at bar, the circumstances supporting the jury's determination were these: The defendant was driving at a speed which placed all responsibility for avoiding injury upon the persons who might be in the particular area; he was neither slowing down nor did he have control of his car which would have enabled him to stop quickly, if necessary to avoid an accident. As to the unlawfulness of her actions, appellant insists that she was violating no law before she struck the curb, in contrast to what she describes as "the typical case" under the pertinent manslaughter statute where "the defendant has either been drinking or is operating his vehicle at excessive speed." Contrary to this argument, appellant committed an unlawful act not amounting to a felony when she drove her car at a speed which endangered the safety of persons and property (Veh. Code, § 22350); furthermore, she failed to yield the right of way to pedestrians approaching on the sidewalk, thus

violating section 21952 of the Vehicle Code. Evidence of her unlawful conduct could also be inferred from the inconsistent statements given by her to the police, since they tended to show a consciousness of guilt. (*People* v. *Mead*, 126 Cal. App.2d 164, 173 [271 P.2d 619].) We are satisfied that the finding of "gross negligence" and of appellant's unlawful conduct was essentially one of fact for the jury; however in view of our conclusion to reverse the judgment on other grounds we refrain from further discussion of the sufficiency of the evidence.

Next it is claimed that the court erroneously refused to read two instructions requested by appellant relative to unconsciousness (CALJIC 71-C (Alternate)[2] and 71-D[3]). Contending that it is the duty of the court to instruct on every theory of the case if it is reasonable and finds support in the evidence (*People* v. *Carmen*, 36 Cal.2d 768, 772-773 [228 P.2d 281]), appellant points to her own testimony that she was "stunned" when her jaw struck the steering wheel and to the testimony of Dr. Brown that she sustained a moderate concussion by reason thereof. Questioned as to whether persons suffering from a "moderate concussion" have full possession of their mental facilities immediately thereafter, the doctor stated: "As a rule, they may be able to do things, but they are done more or less automatically. They are not actually responsible for the things that they are doing for a period of time"; interrogated as to the effect of the blow on appellant's ability to comprehend "what was going on around her," the witness answered: "My opinion

---

[2]CALJIC 71-C (Alternate) reads: "Where a person commits an act without being conscious thereof, such an act is not criminal even though, if committed by a person who was conscious, it would be a crime. This rule of law does not apply to a case in which the mental state of the person in question is due to insanity, mental defect or voluntary intoxication resulting from the use of drugs or intoxicating liquor, but applies only to cases of sound mind as, for example, somnabulists or persons suffering from the delirium of fever or of the involuntary taking of drugs or intoxicating liquor, and other cases in which there is no functioning of the conscious mind and the person's acts are controlled solely by the subconscious mind."

[3]CALJIC 71-D reads: "When the evidence shows that a defendant acted as if he was conscious, the law presumes that he then was conscious. This presumption is disputable, but is controlling on the question of consciousness until overcome by a preponderance of the evidence, which means such evidence as when weighed against the presumption and any evidence supporting the presumption has more convincing force, and from which it results that the greater probability of truth lies therein. The rule of law just announced does not change, or make an exception to, the law which places upon the people the burden of proving defendant's guilt beyond a reasonable doubt."

is that I don't think that she would be [able to comprehend].''
Under cross-examination, Dr. Brown went further and stated
in substance that appellant was suffering at the time in ques-
tion from traumatic amnesia and that her actions were con-
trolled by the subconscious mind.

Under subdivision 5 of section 26, Penal Code, persons are
incapable of committing crime who do the act charged with-
out being conscious thereof (*People* v. *Hardy*, 33 Cal.2d 52
[198 P.2d 865]) ; in that case it was declared that subdivision
5 of section 26 contemplates persons of sound mind ''who
suffer from some force that leaves their acts without volition
[citations]'' (p. 66). In *People* v. *Sameniego*, 118
Cal.App. 165, 173 [4 P.2d 809, 5 P.2d 653], it is said:
''Where there is evidence of the existence of that state of
mind wherein the individual's conscious mind has ceased to
operate and his actions are controlled by the subconscious
or subjective mind it would be error to refuse instructions
as to the legal effect of such unconsciousness.'' As in *People*
v. *Cox*, 67 Cal.App.2d 166 [153 P.2d 362] (cited with
approval in *People* v. *Hardy*, *supra*), it is not here contended
that appellant was unconscious from voluntary intoxication
''but was unconscious from a blow on the head . . . which
blow created traumatic amnesia or automatism, and that
while in such unconscious condition [she] committed an act
without being conscious thereof'' (p. 172).

 Much of the respondent's case was devoted to appel-
lant's actions *after* the accident; specifically her hasty
departure from the scene without rendering aid to her vic-
tims and to certain events (already related) in the stationery
store. It must be apparent that the chief purpose of eliciting
such testimony was to bring appellant's conduct within the
portion of the quoted instructions which defines ''gross negli-
gence'' as ''the exercise of so slight a degree of care as to
justify the belief by the jury that there was an entire indif-
ference to the property and persons of others, or the inference
that there was a conscious indifference to consequences.'' In
support of the relevancy of appellant's conduct *subsequent*
to the accident to show her state of mind, that is, her indif-
ference to the consequences of her acts, the attorney general
cites two cases, neither of which sustains the point contended
for. The first case cited is *People* v. *Mead*, 126 Cal.App.2d
164 [271 P.2d 619], where the defendant was driving while
under the influence of alcohol *prior* to the occurrence of
the accident; in our case there is no suggestion that appellant

had consumed an intoxicating beverage *before* the events in question. In the second case, *People* v. *Costa,* 40 Cal.2d 160 [252 P.2d 1], it appears that the defendant had been driving at a high rate of speed after drinking: "An important question in the prosecution, therefore, was what Costa's actions, as related to the surrounding circumstances, disclosed concerning his state of mind. Was his act of driving at a high rate of speed after having consumed alcoholic beverages mere inadvertence, or did it disclose a conscious indifference to consequences? The fact that, less than one-half hour *before* the accident, an officer who stopped him called his attention to the conditions of his operator's license and the dangers of high speed driving was relevant to this issue" (emphasis added)(p. 166).

Assuming, for argument's sake, that conduct subsequent to the accident is relevant on the issue of a defendant's state of mind, namely, a conscious indifference to consequences, then certainly the appellant was entitled to an instruction on the effect of unconsciousness; certainly she must have been "conscious" in order to have a "conscious indifference to consequences." Nor are we persuaded that there is validity to the further contention that the requested instructions were properly refused because "the acts which gave rise to the offense . . . had already taken place as of the time [appellant's] face hit the steering gear"—in opposing the motion for new trial, the district attorney similarly argued that "the matter of unconsciousness, or partial unconsciousness, or partial consciousness is claimed by the defense only commencing at a time immediately following the commission of the act." If the whole problem is approached in a realistic fashion, it seems obvious that the prosecution introduced evidence of appellant's subsequent conduct as part of one continuous transaction with the thought in mind that her then behavior manifested a callous lack of concern for a stricken fellow human. To maximize such conduct in support of the claim that appellant was guilty of "gross negligence" and at the same time minimize her then behavior on the ground that the offense had already been committed and therefore the instructions on unconsciousness were inapplicable does not comport with our views as to the meaning of the constitutional requirement of a fair trial. The jury, we believe, was entitled to consider whether appellant's conduct should be viewed in the exculpatory light of competent medical testimony that there was there and then no functioning of the conscious mind and that

appellant's acts were controlled by the subconscious; the verdict was general in nature, and it would be pure speculation to conclude that the jury did not adopt the definition of "gross negligence" wherein mention is made of the "conscious indifference to consequences." Upon an examination of the entire cause, applying the tests discussed in *People* v. *Watson*, 46 Cal.2d 818 [299 P.2d 243], we are of the opinion that the error complained of resulted in a miscarriage of justice (Const., art. VI, § 4½).

█ Other assignments of error are without merit. First, it is claimed that the court erroneously excluded testimony of Mr. Lissak through whom appellant sought to prove the average time it took an average person to master driving with his or her left foot; two other questions were sought to be propounded: (1) whether a cast on the right foot would interfere with the operation of a motor vehicle with the left foot only, and (2) whether, based on certain hypothetical facts, the defendant had become confused on hearing a lot of noise before the accident. The court refused to permit proposed questions (1) and (2), being of the view that they pertained to matters within the province of the jury and not subject to expert testimony. Mr. Lissak had never trained the appellant—the record discloses that he never saw her until the day of his appearance in court. With respect to the wearing of a cast, the relevant issue was not what the effect thereof would be on other individuals but rather the effect of the cast on appellant. As to the issue of emotional stress or confusion, the matter was one within the field of common knowledge and experience, and properly for argument to the jury. (*People* v. *Collier*, 113 Cal.App.2d 861, 871 [249 P.2d 72].) In the case just cited, the defense sought without success to present expert testimony on the relationship between emotional tendencies and the ability to testify; the subject, the court held, was for the jury's evaluation. █ Second, certain motion pictures made a number of days after the accident were offered for the purpose of establishing appellant's ability to drive with a cast on her leg; the court refused to permit the pictures to be shown, declaring that they did not prove or disprove any material matter. No prejudice appears; paraphrasing *People* v. *Johnston*, 48 Cal.2d 78, 87 [307 P.2d 921], it does not appear that the jury could have drawn pertinent inferences as to defendant's driving ability at the time of the accident from photographs taken of her while operating her automobile several days later.

■ Next, appellant points to several instances where the prosecutor was assertedly guilty of misconduct requiring a reversal. Prejudice has not been made manifest. For example, complaint is made that the prosecutor went beyond the record during his argument to the jury by suggesting that the jurors try driving with the left foot; then he referred to his own driving experiences and said that a person could not drive with the left foot without training. Although most of these statements went in without objection, the prosecutor also qualified his argument by asking the jurors to wait until after the trial before they undertook to carry out his suggestions. The jury was properly admonished that the prosecutor's argument was not evidence, during his summation and before submission of the cause. Nor are we persuaded that the record sustains the contention that the deputy district attorney expressed his personal belief in appellant's guilt, either with respect to the interrogation of Officer Boggs (whose examination is said to have been interspersed with leading questions) or otherwise.

■ Misconduct by the trial court is also asserted. The challenged statement to the jury occurred after certain proceedings at the bench: ''If you are curious about what takes place at the bench, you should see the movie 'Anatomy of a Murder,' but wait until this case is over.'' No objection was made by appellant's counsel to the tenor of the court's remarks; furthermore we are of the view that the statement (although indeed unfortunate) constituted neither advocacy nor an intimation of an opinion on the facts. Appellant's reply brief cites a recent decision of the United States Court of Military Appeals (*United States* v. *Allen*, 11 U.S.C.M.A. 539) where the prosecutor made certain references in his closing argument to the book (not the picture) of the same name; the reviewing court deemed such references prejudicial, but they were not casual, as here, and of an aggravated character under the facts there present.

■ Finally, it is contended that the motion to disqualify (Code Civ. Proc., § 170.6) was improperly denied. The statute provides in part that where the judge scheduled to try the case is known at least 10 days before trial date, the motion shall be made at least five days before that date. Upon the denial of appellant's motion under section 995 of the Penal Code on September 23, 1959, by Judge Rhone in department 104, trial was set for October 13, 1959. On the latter date the cause was called for trial in department 13 and continued to

November 2, 1959, on motion of the appellant; all witnesses were instructed. On November 2, appellant's counsel filed a written motion, dated October 31, 1959, to disqualify Judge Rhone. The motion was denied for untimeliness. Under the foregoing facts, the ruling was clearly correct. Appellant urges that the placing of the case on the docket of a particular department of the Los Angeles criminal courts does not necessarily constitute an assignment of a judge to try the case, and that cases are often transferred from one department to another because of calendar congestion. What may be done to relieve calendar congestion does not change the circumstances above set forth which reflect the calendaring of the case in department 104 where Judge Rhone was presiding.

The judgment (order granting probation) and the order denying a new trial are reversed.

Wood, P. J., and Fourt, J., concurred.