[Crim. No. 5370. In Bank. Jan. 9, 1953.]

THE PEOPLE, Respondent, v. NORMAN ROBERT COSTA, Appellant.

162

Smith & Zeller and Charles A. Zeller for Appellant.

Edmund G. Brown, Attorney General, and Gail A. Strader, Deputy Attorney General, for Respondent.

EDMONDS, J.—Norman Robert Costa was convicted by the court, sitting without a jury, of manslaughter committed in the driving of an automobile.

During early morning hours, Costa was driving a Cadillac automobile around the countryside with three other young men. All of them had been drinking and, at one time during the morning, Costa stopped and purchased a half-case of beer. Earlier, he had consumed three or four whisky highballs. He and his passengers drank some of the beer while they drove, Costa having had two cans of it shortly before the accident. By stipulation of the parties, a chemist's report was admitted into evidence showing that, about two and one-half hours after the collision, Costa's blood had an alcoholic content of .12 per cent.

Over objection, evidence was admitted that Costa's operator's license was conditional, although the conditions had expired prior to the date of the wreck. The conditions were that Costa should not "drive while drinking" and must not speed.

Approximately one-half hour before the collision occurred, Costa was stopped by Wendell Nicol, a state highway patrolman. Objections to most of the officer's testimony were overruled. He stated, "I had just had another violator stopped when I first observed him (Costa)." At that time, he estimated, Costa was driving "[b]etween 50 and 60 miles an hour" along a two-lane side road which intersects the freeway, a divided four-lane highway. The officer pursued Costa for approximately 4 miles before catching up with him, during a portion of which distance Costa drove on the freeway at a speed of about 70 miles per hour. When Nicol finally was able to come close enough to clock the speed of Costa's automobile it was again on a side road and had slowed to 55 miles per hour.

Costa gave Nicol no explanation for his speed. He "just stated that he realized he was wrong and that he shouldn't have been doing that." The officer noticed that Costa's driver's license "was a probationary license and I didn't want to prosecute the man unfairly by issuing him a citation without being definite as to his speed so I reprimanded him for driving like that and warned him that he had a probationary license and that if he got a citation or was in violation of the law that he would lose his license and he assured me that he would drive more carefully in the future, and I released him on that basis." The odor of Costa's breath indicated that Costa had been drinking, but "not enough . . . to cause him to be examined."

Another witness who had been driving along the freeway on the morning of the accident testified, over objection, that about six or seven minutes before the collision he observed the Costa automobile traveling at approximately 85 to 90 miles per hour. Shortly thereafter, Costa passed a state highway patrol car parked, with its motor running, about 100 to 150 feet off the opposite side of the freeway. The two officers in the patrol car estimated the speed of the Costa automobile to be in "excess of 80" miles per hour, "between eighty and eighty-five." They immediately started in pursuit, driving across the freeway and turning left to follow Costa. In chasing him for approximately 2 miles, the police car reached a top speed of about 92 miles per hour. No signal was given Costa to stop.

Earl Sked, the driver of the police car, testified at the preliminary examination, the transcript of which was admitted into evidence by stipulation. He said that the Costa auto-

mobile passed other vehicles to the left in the "passing lane" and then returned each time to the right lane. He kept watching the "large taillights of the Cadillac" for a mile or one and one-half miles, meanwhile following in the passing lane.

When the police car had reached a point approximately one-quarter of a mile behind the Cadillac, he could see "headlights other than the Cadillac up in the near vicinity of the Cadillac; suddenly, he saw a set of taillights divert sharply to the left . . . off the roadway at a very abrupt manner; there was a cloud of dust and for a second our vision was obscured from the dust, a tree in the road." He stated: "I did not see the lights that abruptly turned off prior to the accident; there was another car to the right of the Cadillac." The other automobile was traveling in the right-hand lane, but its lights were not the ones which he saw veer off the highway. He explained that he was concentrating on his driving and his attention was focused on the Cadillac. He saw only two cars, he said, and "didn't know there was any Jeep there."

When he reached the scene of the accident, Officer Sked brought the police car to a stop behind the Cadillac. The automobile which had been traveling in the right-hand lane pulled off on the shoulder of the highway and stopped temporarily. However, according to Officer Sked, "due to the excitement of the moment they got away before we could contact them." He asked Costa for his driver's license and Costa handed it to him "stating that it was a conditional license." Officer Sked stated: "I looked the car over and I noticed some canned beer in the back and I asked him about that and he says yes that he had had a couple of drinks and he guessed that he was driving a little bit too fast."

Lee Marshall, a state highway patrolman riding with Officer Sked, testified: "I could see a triangle of three lights, three taillights. . . . There was a taillight in the right hand lane, one in the center lane and the Cadillac in behind." This was about 10 or 15 seconds before the crash and the Cadillac was traveling in the right-hand lane. Then the Cadillac, according to Officer Marshall, "moved over" and "blotted out the taillights" of the vehicle in the left lane and "all at once a set of taillights went off in a sharp curve." He said that the jeep was in the left-hand lane and the Cadillac turned into the left-hand lane and ran into the jeep and knocking

him off the road." According to him, only two or three seconds elapsed between the time the Costa car turned into the left lane and the collision.

After the accident, the jeep lay, on its left side, off the highway in the dividing strip. The four occupants were unconscious and tangled in the wreckage. George D. Marino, who, it is stipulated, died as a result of the accident, was lying along the left side of the jeep. Between five and ten minutes later, Officer Marshall talked to him. Over objection, Officer Marshall was permitted to testify as to this conversation. Marino said he had been driving the jeep. In response to the question, "What happened?" Marino said, "The man hit us in the rear."

None of the occupants of the jeep testified at Costa's trial. One of the passengers in Costa's automobile was asleep when the accident occurred and had no knowledge of how it happened. A second was not called. The testimony of the third passenger, a member of the armed forces, was given by deposition.

This witness said that he was sitting on the right-hand side of the back seat. According to him, the Cadillac speedometer registered 90 miles per hour shortly before the crash. He first saw the jeep about 40 yards ahead of them when the Cadillac was in the left lane beside another automobile to its right. He did not see the jeep swerve into the left lane, it was there when he first noticed it. He saw "the whole back part of the Jeep" from the spare tire up. Realizing that there would be a crash, he called to his friend in the front seat to duck and threw himself to the floor in the back. He did not see the collision.

Costa, testifying on his own behalf, said that he was driving about 70 or 75 miles per hour immediately prior to the accident. He stated that he pulled over to the left lane to pass a slower moving vehicle ahead of him in the right lane. Before so doing, he saw no other vehicle ahead in the left lane. He glanced to the left and right to be certain that he was clear at an intersection and then momentarily looked to the right to see if he had clearance around the automobile he was passing. According to Costa, "As I was passing it, . . . I looked up and I saw the vehicle I hit." It was entirely within the left lane, about 60 feet in front of his automobile, and "was on an angle." He said: "It was directly in front of me but to me it was at an angle and my left front hit the left rear corner of it." He tried to

apply his brakes before the collision, but things happened so rapidly that he did not recall whether he was successful in so doing.

In support of his appeal from the judgment of conviction, Costa contends that the trial court committed prejudicial error in the admission of evidence concerning the warning given him for speeding earlier in the morning, the conditional license which he held, and the statement by Marino after he regained consciousness. He also claims that the evidence is insufficient to sustain the judgment. The attorney general disputes each of these contentions.

The statute under which Costa was convicted provides: "Manslaughter is the unlawful killing of a human being, without malice. . . . 3. In the driving of a vehicle—(a) In the commission of an unlawful act, not amounting to felony with gross negligence; or in the commission of a lawful act which might produce death, in an unlawful manner, and with gross negligence." (Pen. Code, § 192.3[a].) "Gross negligence has been repeatedly defined in the California cases as 'the want of slight diligence,' 'an entire failure to exercise care, or the exercise of so slight a degree of care as to justify the belief that there was an indifference to the things and welfare of others,' and 'that want of care which would raise a presumption of the conscious indifference to consequences.' " (*Cooper* v. *Kellogg,* 2 Cal.2d 504, 510-511 [42 P.2d 59]; *Barkis* v. *Scott,* 34 Cal.2d 116, 123 [208 P.2d 367]; *Weber* v. *Pinyan,* 9 Cal.2d 226, 232-233 [70 P.2d 183, 112 A.L.R. 407]; *Kastel* v. *Stieber,* 215 Cal. 37, 46-47 [8 P.2d 474]; *Krause* v. *Rarity,* 210 Cal. 644, 654-655 [293 P. 62, 77 A.L.R. 1327].)

 An important question in the prosecution, therefore, was what Costa's actions, as related to the surrounding circumstances, disclosed concerning his state of mind. Was his act of driving at a high rate of speed after having consumed alcoholic beverages mere inadvertence, or did it disclose a conscious indifference to consequences? The fact that, less than one-half hour before the accident, an officer who stopped him called his attention to the conditions of his operator's license and the dangers of high speed driving was relevant to this issue.

 Costa concedes that the evidence did not disclose a "previous violation of law." Therefore, there is little merit to his argument that it "must necessarily have had an inflammatory effect upon the mind of the Court." However,

even if it tended to show a previous crime, it would not have been inadmissible for the purposes for which it was introduced. ▮ ''It is settled in this state that except when it shows merely criminal disposition, evidence which tends logically and by reasonable inference to establish any fact material for the prosecution, or to overcome any material fact sought to be proved by the defense, is admissible although it may connect the accused with an offense not included in the charge.'' (*People* v. *Woods*, 35 Cal.2d 504, 509 [218 P.2d 981]; *People* v. *Dabb*, 32 Cal.2d 491, 499-500 [197 P.2d 1]; *People* v. *Peete*, 28 Cal.2d 306, 314-315 [169 P.2d 924].)

According to Costa, ''The prosecution offered and there was received in evidence, over the appropriate objection of the defendant, extensive testimony with regard to a conditional license, the conditions of which had expired prior to the date of the accident in question.'' He points to his own testimony upon cross-examination as having been erroneously admitted over objection. Although thorough, it hardly warrants the use of the adjective ''extensive.'' He admitted, without objection, that his license was conditional. Objection was made, and overruled, to only two questions. The reply to the first established that his conditional license had not been replaced by an unrestricted license at the time of the accident. The second question dealt with the conditions of his license.

▮ If it be assumed that the admission of this evidence was erroneous, it was not prejudicial. A careful examination of the entire record in accordance with article VI, section 4½ of the Constitution, discloses overwhelming evidence of Costa's guilt exclusive of all the challenged testimony. Under the circumstances, it cannot be said that the admission of evidence concerning his conditional license resulted in a miscarriage of justice which would justify a reversal of the judgment. (Const., art. VI, § 4½; cf. *People* v. *Dabb*, *supra*, p. 501.)

▮ It is argued that ''the volunteer remark of the officer [Nicol], that prior to stopping Costa he had stopped 'another law violator' '' was inadmissible. No objection was made to the officer's statement and counsel for Costa did not move to strike it as unresponsive or a conclusion of the witness. In any event, it cannot be said that this comment in the common parlance of the police force was in any sense prejudicial.

■ Costa contends that the statement by Marino after he regained consciousness was inadmissible because the lapse of some five to ten minutes removed it from the operation of the res gestae rule. However, during this interval Marino was unconscious and could not have been planning his remarks or reconstructing the occurrence in his mind. The situation of itself satisfied the requirements of the res gestae rule. ■ "Declarations to be a part of the *res gestae,* are not required to be precisely concurrent in point of time with the principal fact, if they spring out of the principal transaction, if they tend to explain it, are voluntary and spontaneous, and are made at a time so near it as to preclude the idea of deliberate design, then they are to be regarded as contemporaneous, and are admissible." (*People* v. *Vernon,* 35 Cal. 49, 51 [95 Am.Dec. 49] ; Code Civ. Proc., § 1850; *Lane* v. *Pacific Greyhound Lines,* 26 Cal.2d 575, 581-584 [160 P.2d 21] ; *Showalter* v. *Western Pac. R. R. Co.,* 16 Cal. 2d 460, 465-470 [106 P.2d 895].)

■ Upon oral argument, Costa raised, for the first time, the contention that Marino's statement was not spontaneous because it was made in response to a question by Officer Marshall. This argument has no merit. The officer did not engage in any extended interrogation of Marino which might have led· the latter to deliberate in· an effort to explain what happened or to defend his own actions. He simply made the inquiry which anyone arriving upon the scene might have asked the injured man, "What happened?" The response was voluntary and spontaneous and the circumstances precluded the idea of deliberation.

In *Showalter* v. *Western Pac. R. R. Co., supra,* the statement held to be admissible was made in response to the question, "How in the world did it happen, Joe?" The reply to a question as to "where the other car came from" was held to be admissible as a part of the res gestae in *Lane* v. *Pacific Greyhound Lines, supra.* It would be unreasonable to prohibit evidence concerning spontaneous declarations in every case where they are prompted by a simple inquiry as to what occurred. The natural reaction of anyone arriving at the place where an accident has occurred is to make such inquiry. The rule for which Costa contends would, in effect, bar resort to the res gestae doctrine in virtually every case of accidental injury. If the statement otherwise meets the tests of the res gestae rule, it should not be held inadmissible

simply because it was prompted by the question of another person.

 If it be assumed that the trial court, in its discretion, should not have admitted Marino's statement in evidence, the error was not prejudicial. Costa admits that he struck the jeep from the rear, which is the only import of the remark made by Marino. It does not tend in any manner to refute Costa's argument that he hit the left rear corner of the jeep, rather than striking it squarely. Marino did not say what portion of the rear of the jeep was hit.

 Costa's final contention that the evidence is insufficient to support the judgment cannot be sustained. The evidence is conflicting, but is amply sufficient to have convinced the trial court that Costa was guilty of gross negligence. It tends to prove that Costa, traveling at a speed approaching 90 miles per hour after having consumed several alcoholic drinks, pulled out into the passing lane directly behind the jeep which already was occupying that space and traveling at a legal rate of speed. Without noticeably reducing his speed, he rammed the smaller vehicle. Such conduct demonstrates an entire failure to exercise care and a conscious indifference to consequences.

The judgment is affirmed.

Gibson, C. J., Shenk, J., Traynor, J., and Spence, J., concurred.

Schauer, J., concurred in the judgment.

CARTER, J.—I concur in the judgment of affirmance and agree generally with the reasoning upon which it is based. I do not, however, agree with that portion of the majority opinion which holds that evidence of other crimes than that with which the defendant is charged may be admitted even though such evidence may tend to connect the defendant with the crime charged. No such evidence was offered in this case and therefore the discussion on this subject is dictum. My position with respect to the admission of evidence[b] of other crimes than that with which a defendant is charged is set forth in my dissents in the following cases: *People* v. *Peete,* 28 Cal.2d 306 [169 P.2d 924] and *People* v. *Westek,* 31 Cal. 2d 469 [190 P.2d 9].

Appellant's petition for a rehearing was denied February 5, 1953.