[Crim. No. 5705.   In Bank.   Nov. 28, 1955.]

## THE PEOPLE, Respondent, v. JAMES TARANTINO, Appellant.

Leo R. Friedman for Appellant.

Charles R. Garry and George Olshausen as Amici Curiae on behalf of Appellant.

Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, and Victor Griffith, Deputy Attorney General, for Respondent.

Thomas C. Lynch, District Attorney (San Francisco) as Amicus Curiae on behalf of Respondent.

THE COURT.—Defendants Tarantino and Eichenbaum were indicted on one count of conspiracy to commit extortion (Pen. Code, § 182) and three counts of extortion (Pen. Code, § 518). Defendant Tarantino alone appeals from a judgment of conviction entered on a jury verdict of guilty on all four counts and from an order denying his motion for a new trial.

Tarantino (herein sometimes called defendant) published a weekly magazine and made weekly radio broadcasts. Nine witnesses testified that they had been "blasted" or threatened with "blasting" by defendant, but that he stopped his attacks and threats after they paid money to Eichenbaum, sponsored advertisements in defendant's magazine, and, in one case, agreed to sell the magazine to the public. Much of the evidence against defendant consisted of recordings of conversations in his hotel room introduced over objection that they had been obtained in violation of the provisions of the United States Constitution and the California Constitution against unreasonable searches and seizures. An inspector in the San Francisco Police Department testified that at the suggestion of the district attorney and the chief of inspectors he employed a sound engineer and had a locksmith make a key to defendant's hotel room. In December, 1951, the engineer, acting under the direction of the inspector and using the key that the locksmith made, entered defendant's room and installed a microphone behind a small hole in the ceiling. Wires from the microphone were strung up the airshaft, across adjacent roofs, and into an apartment that the police and district attorney had rented in a nearby building. The inspector and the engineer testified that they acted without defendant's knowledge or permission. From December, 1951, until February, 1953, the police listened to every sound that was made in defendant's room. They did not consider all of the conversations they overheard relevant to the investigation, but recorded only those they considered "pertinent" and "interesting." The recordings, totalling 198 reels of tape or approximately 500 hours of listening time, were edited by the district attorney and the police, arranged according to subject matter, and rerecorded in part on composite tapes. The district attorney introduced 60 selected excerpts in evidence, and since they related to threats, promises, and demands for money, they constituted corroborative evidence of the testimony of the prosecution's witnesses.

Defendant contends that this evidence was obtained by unconstitutional means (*Irvine* v. *California* (1954), 347 U.S. 128, 132 [74 S.Ct. 381, 98 L.Ed. 561]; *Wolf* v. *Colorado* (1949), 338 U.S. 25, 27 [69 S.Ct. 1359, 93 L.Ed. 1782]) and should therefore have been excluded (*People* v. *Cahan* (1955), 44 Cal.2d 434, 444 [282 P.2d 905]; *People* v. *Berger* (1955), 44 Cal.2d 459, 462 [282 P.2d 509]). The district attorney contends, however, that section 653h of the Penal

Code permits the police to install and use a dictograph as was done in this case and that unless the section is unconstitutional the recordings were not obtained in violation of the Constitutions. ■ Section 653h provides that "Any person who, without the consent of the . . . occupant, installs or attempts to install or use a dictograph in any house, room, [or] apartment . . . is guilty of a misdemeanor; provided, that nothing herein shall prevent the use and installation of dictographs by a regular salaried peace officer expressly authorized thereto by the head of his office or department or by a district attorney, when such use and installation are necessary in the performance of their duties in detecting crime and in the apprehension of criminals." It was pointed out in *People* v. *Cahan, supra,* that this section "does not and could not authorize violations of the Constitution" and that the proviso under which the officers in that case and this case "purported to act at most prevents their conduct from constituting a violation of that section itself." (44 Cal.2d at 437.) Since the statute does not purport to authorize any installations whatever, to interpret the proviso as authorizing conduct that the Constitution prohibits would not only render it subject to attack on that ground (*Irvine* v. *California* (1954), *supra,* 347 U.S. 128, 132), but read into it words that are not there. ■ Moreover, installations by police officers that violate the constitutional provisions cannot be made lawful by the authorization of the head of the police department or the district attorney. Those provisions protect the people from unreasonable invasions of their privacy by the police, and the determination of what is reasonable cannot be left to them. "Absent some grave emergency, the Fourth Amendment has interposed a magistrate between the citizen and the police. This was done not to shield criminals nor to make the home a safe haven for illegal activities. It was done so that an objective mind might weigh the need to invade that privacy in order to enforce the law. The right of privacy was deemed too precious to entrust to the discretion of those whose job is the detection of crime and the arrest of criminals." (*McDonald* v. *United States* (1948), 335 U.S. 451, 455 [69 S.Ct. 191, 93 L.Ed. 153]; see also *United States* v. *Jeffers* (1951), 342 U.S. 48, 51 [72 S.Ct. 93, 96 L.Ed. 59]; *Johnson* v. *United States* (1948), 333 U.S. 10, 14 [68 S.Ct. 367, 92 L.Ed. 436]; *United States* v. *Lefkowitz* (1932), 285 U.S. 452, 464 [52 S.Ct. 420, 76 L.Ed. 877, 82 A.L.R. 775]; *Drayton* v. *United States* (1953), 205 F.2d 35, 37.)

■ It is true that the secret entry of defendant's room and the hiding of the microphone were done by the engineer, a private person, and that a lawless search and seizure by a private person acting in a private capacity is not a violation by a state or federal agency of constitutional guaranties. (*Burdeau* v. *McDowell* (1921), 256 U.S. 465, 475 [41 S.Ct. 574, 65 L.Ed. 1048, 13 A.L.R. 1159].) ■ The engineer, however, was employed by the district attorney and the police department. He worked under the direct supervision of an inspector of police, and was paid with public funds. Accordingly, his installation of the microphone as an agent of public officials and the clandestine eavesdropping by the police violated the constitutional provisions. (*Irvine* v. *California* (1954), *supra*, 347 U.S. 128, 132; *Wolf* v. *Colorado* (1949), *supra*, 338 U.S. 25, 27.) Evidence so obtained must be excluded. (*People* v. *Cahan* (1955), *supra*, 44 Cal.2d 434, 444; *People* v. *Berger* (1955), *supra*, 44 Cal.2d 459, 462.)

The People contend, however, that the admission of the evidence did not result in a miscarriage of justice and that the judgment must therefore be affirmed. (Cal. Const., art. VI, § 4½.) In support of this contention it is urged that the verdicts were supported by the testimony of 21 witnesses, that several of these witnesses testified that defendant committed acts of extortion similar to those with which he was charged, and that one of the acts of extortion for which he was indicted, that charged in Count 2, occurred before the microphone was hidden in his room. As to Count 2 it appears to us that the evidence, entirely independent of that illegally obtained, convincingly, if not overwhelmingly, establishes guilt, and, for the reasons hereinafter more particularly stated, we conclude that the verdict on this count should not be disturbed.

■ As to Counts 1 (conspiracy of defendants Tarantino and Eichenbaum to commit extortion), 3 (extortion from Rourke), and 4 (extortion from Armstrong), the illegally obtained recordings contain evidence immediately and directly tending to prove the charged offenses. The 60 excerpts of illegally obtained recordings were played repeatedly to the court and jury. They contained the names of the complaining witnesses and defendant's recorded remarks connected these names, insofar as Counts 1, 3 and 4 are concerned, with threats and demands for money. Since the recordings clearly constituted a substantial and important part of the evidence pertinent to the last mentioned counts, it cannot be said

that the verdicts as to those counts rested on evidence independent of them. (See *Stevens* v. *Snow* (1923), 191 Cal. 58, 67 [214 P. 968].) Accordingly their admission in evidence deprived the defendant of a fair trial and resulted in a miscarriage of justice which necessitates a new trial as to such counts.

The circumstances of the commission of the offense against Paul Vlasoff, Count 2, as related in his testimony, are as follows: He had known Tarantino and Eichenbaum since 1950. In 1950 Eichenbaum came into the Club Continental, a bar operated by Vlasoff, and "told" Vlasoff to put an advertisement in Tarantino's magazine, *Hollywood Life*. Vlasoff said that he did not care to advertise his bar in Tarantino's magazine. Eichenbaum said, "You don't have to do that, just put a blood bank ad in there." Vlasoff agreed to place the advertisement and paid $25.

In 1951 Vlasoff operated both the Club Continental and a card room. Eichenbaum came into the card room in July or August, 1951, and said that Tarantino was "awfully mad" at Vlasoff and was going to "blast" him on his radio program the next day. At Vlasoff's request Eichenbaum placed a telephone call to Tarantino and Vlasoff talked with him. Tarantino told Vlasoff that Vlasoff was "getting away with murder, booking horses, and a crap game," and that Tarantino was going to "blast" him. Vlasoff said, "What can I do to make up? . . . I don't want you to blast me on the air tomorrow, otherwise I'll have to close up the place." Tarantino replied that Vlasoff should talk with Eichenbaum. Eichenbaum talked further with Tarantino on the telephone, then told Vlasoff that Tarantino would "forget the incident" for $500. Vlasoff protested against the amount. After further negotiations they agreed upon a figure of $200. Also Eichenbaum told Vlasoff, "you will have to put an ad in there to keep him quiet." Vlasoff agreed to this. He paid the $200 and was billed for but did not pay for an advertisement in *Hollywood Life*.

As stated, the offense charged in Count 2 occurred, according to the testimony of Vlasoff, in July or August, 1951. The listening and recording device by which evidence was illegally obtained was not installed until December, 1951. There is no mention in the evidence obtained by the device of the alleged offense against Vlasoff. There is brief mention by Tarantino in one of his recorded conversations of "Paul" and "the Continental" but it is not in connection with any extortion.

Independently of the recordings, the effect of Vlasoff's testimony describing the commission of the offense against him is impressively strengthened by the testimony of other witnesses, the victims of Counts 3 and 4 and the victims of extortions not charged against the defendants, showing the pattern of defendant's criminal operations. This admissible evidence of other offenses is of such probative, corroborative effect that the record as a whole, notwithstanding its further content of illegally obtained evidence, falls short of leading us to the opinion that as to this count of the indictment (Count 2), defendant's conviction can be said to constitute a miscarriage of justice. (Cal. Const., art. VI, § 4½.)

██ In this connection it is to be noted that the jury were instructed that "Each count set forth in the Indictment charges a separate and distinct offense. You must consider the evidence applicable to each alleged offense as though it were the only accusation before you for consideration, and you must state your finding as to each count in a separate verdict, uninfluenced by the mere fact that your verdict as to any other count or counts is in favor of, or against, the defendants. They may be convicted or acquitted upon any or all of the offenses charged, depending upon the evidence and the weight you give to it, under the Court's instructions." It is to be presumed that the jury obeyed this instruction and was not influenced to return a guilty verdict as to Count 2 upon evidence other than that pertinent to this count. (*People* v. *Dabb* (1948), 32 Cal.2d 491, 499 [197 P.2d 1] [it must be assumed that the jury followed instructions that evidence as to offenses of codefendants which was not connected with defendant could not be considered against him] ; *People* v. *Lamendola* (1953), 119 Cal.App.2d 570, 572 [259 P.2d 982] [it must be presumed that the jury followed instructions that they were to consider certain evidence solely for the purpose of impeachment] ; *People* v. *Grimes* (1952), 113 Cal.App.2d 365, 371 [248 P.2d 130] ["It will be presumed that the jurors were true to their oaths and followed the various admonitions and instructions of the court," particularly with reference to evidence of prior similar offenses] ; *People* v. *Martinez* (1937), 19 Cal.App.2d 599, 604 [66 P.2d 161] [it may be assumed that the jury followed the instruction that the extrajudicial statement of each defendant could be considered only as to him and not as to his codefendants] ; *People* v. *Griffin* (1935), 9 Cal.App.2d 246, 249 [49 P.2d 321] [it must be assumed that jury heeded

the instruction that evidence applicable to one defendant can be considered only as against that defendant].)

In addition to the claim that the recordings were inadmissible because they were illegally obtained, defendant presents other contentions. ▋ He urges that he was denied a reasonable opportunity to hear and decipher the illegally obtained recordings before or after excerpts therefrom were received in evidence. The record shows that defense counsel were offered and did not avail themselves of opportunities to hear the recordings. ▋ Defendant urges, further, that the court should have granted his requests for copies of transcriptions, prepared by the prosecution, of those portions of the recordings which were not introduced in evidence. Defendant, whose conversations were the subject of the recordings and transcriptions, does not suggest what useful purpose would have been served by his counsel's hearing the recordings or reading the transcriptions; he does not suggest that they contained anything relevant to this case.

▋ Defendant complains of the admission of evidence, some properly and some illegally obtained, which tends to show extortions and attempted extortions other than those charged. Such evidence is relevant to the Vlasoff extortion for it tends to show criminal methods and purposes similar to those shown by the testimony of Vlasoff. (See *People* v. *Costa* (1953), 40 Cal.2d 160, 167 [252 P.2d 1], and cases there cited.) Accordingly, such of it as was legally obtained was properly admitted; the portions of it which were unlawfully obtained were merely cumulative of the proof, which as hereinabove discussed, satisfactorily establishes guilt on Count 2 independently of the evidence improperly admitted.

▋ Defendant complains of the admission in evidence of approximately 200 issues of his magazine, *Hollywood Life,* which were found in his room at the time of his arrest. These magazines are clearly relevant and in themselves constitute overwhelming proof of certain of the elements in the case against defendant. He argues, however, that prejudice from the admission of this evidence appears from the facts that the magazines contained not only relevant material but also material not relevant to the crimes charged and that the jury asked for and were allowed to have the magazines in the jury room during their deliberations. Defendant's original objection to the introduction of this evidence was on the sole ground that the prosecution had not shown that defendant edited or wrote the material in *Hollywood Life.* The prosecution had shown, however, that defendant was its

publisher. Thereafter, defendant asked that the magazines be excluded from evidence and suggested that only such portions as were pertinent should be received in evidence. The magazines as a whole, and not merely selected portions thereof, were relevant since, as shown by other evidence, they were an instrumentality by which defendant carried out his threats to "blast" his victims and the victims, as Vlasoff testified, were "told" to advertise in the magazine.

Tarantino on direct examination testified in effect that he did not commit the extortions charged. The prosecution, over objection, cross-examined him as to other, similar offenses to which he had not referred in his testimony in chief. He contends that his cross-examination improperly went beyond "matters about which he was examined in chief" (Pen. Code, § 1323). The contention is without merit. Since Tarantino's testimony on direct examination amounted to a general denial of the truth of the charges against him, "the permissible scope of cross-examination is very wide." (*People* v. *Zerrillo* (1950), 36 Cal.2d 222, 228 [223 P.2d 223].) The cross-examination here was directed primarily to matters implicit in Tarantino's general denial, i.e., his purpose and motive, his general plan and scheme.

Defendant urges that the following circumstances show that the verdicts were coerced: The jury retired to deliberate on the morning of December 18 and the verdicts were returned on the evening of December 22. At 4 p. m. on December 19 the jury came into court after they had sent the judge a note signed by the foreman which stated, "We cannot agree on any count." The foreman told the judge that the division of the jury was nine to three. (At no time was it disclosed how many votes were for acquittal and how many for conviction.)

At 10:40 a. m. on December 21 the foreman gave the judge a note which stated that the jury "stand 11 to 1, and no chance of a change"; another juror had written, "Any further argument is very likely to result in bodily harm to one or more jurors." The judge instructed the jury at some length to consider the case dispassionately, and said, "I might just say, and this is not a threat, that if any juror inflicts any bodily harm on any other juror, I certainly would take care of that situation and deal with it in a manner that would make the offender very sorry that the incident occurred, if it does occur. Now, that is not a threat; that is just a rather blunt statement, but I beg all of you to put

aside any ill feeling that you might have, if you have any. . . . You are not partisans or advocates but judges. Now, if—don't let any feeling of pride or feeling of personal hurt or animosity prevent you from discussing this case with calmness and with equanimity.''

On December 22 the judge received three notes. One, written by the foreman on the night of December 21, stated, ''deliberation is proceeding in a friendly atmosphere. We are determined to continue in this manner whether we eventually reach a verdict or not.'' A note from a juror, marked 3:35 p.m., December 22, stated, ''The opposed juror states he is withholding information from us until tomorrow morning. He states he is protecting three interests, the State, the defense and the jury.'' And another note from the foreman, also marked 3:35 p.m., December 22, stated, ''We are not deliberating now and have not been deliberating during many long periods of time previous to this. . . . It is the opinion of everyone that we cannot do any more.''

At 4:30 p.m. the judge called the jury into the courtroom and said, ''Now, it is your duty, under your oaths as jurors, to deliberate, and to refuse to discuss the case further is a violation of your oaths as jurors. I know that you have been very patient and have been here a long time, and maybe tempers wear thin, but it is your duty to deliberate until the court excuses you.'' The judge pointed out that the jury need not be in agreement as to all counts and asked them to deliberate ''somewhat further.'' At 8:45 p.m. they returned with the verdicts.

There was nothing in the statements of the trial judge, representative portions of which are quoted above, which suggested an opinion as to what verdicts should be reached, nor was there any improper pressure upon the jury to agree. (*Cf. People* v. *Walker* (1949), 93 Cal.App.2d 818, 821-825 [209 P.2d 834], and cases there cited and summarized; *People* v. *Crowley* (1950), 101 Cal.App.2d 71, 75-78 [224 P.2d 748].) It does not appear that the judge required the jury to prolong their deliberations unduly, particularly in view of the fact that the trial had consumed 44 days. The judge dealt properly with the suggested ''bodily harm to one or more jurors.'' We conclude that the record does not support defendant's claim that the verdicts were coerced.

Other arguments of defendant do not relate to matters which could have had a prejudicial effect as to the conviction upon Count 2 and need not be specifically discussed.

The judgment and order on Count 2 are affirmed; on Counts 1, 3 and 4 the judgment and order are reversed and the cause is remanded for a new trial.

SPENCE, J.—I concur.

The majority opinion reverses as to counts 1, 3, and 4 upon the authority of *People* v. *Cahan,* 44 Cal.2d 434 [282 P.2d 905], and *People* v. *Berger,* 44 Cal.2d 459 [282 P.2d 509]. I dissented in those cases and my views remain unchanged concerning the undesirability there of departing from the previously established nonexclusionary rule. Nevertheless, the majority there decided that the earlier cases should be overruled, and that the exclusionary rule should be adopted. Since the decision of the cited cases, the exclusionary rule has become the rule in this state governing the admissibility of evidence; and the trial courts have been required to accept and apply it. I have reluctantly determined that I should now yield to the views of the majority and accept the exclusionary rule as the established rule.

The reasons for my determination may be briefly stated. The exclusionary rule, as established by the Cahan and Berger decisions, is admittedly merely "a rule of evidence." (*People* v. *Cahan, supra,* p. 450.) Concerning the desirability of adopting the exclusionary rule, there has been sharp disagreement throughout the years among the best legal minds. It being merely a rule of evidence, I believe that the paramount consideration now, in the interest of the orderly administration of justice in this state, is that there be a firmly established rule which will not be subject to change from time to time with the possible change in the views of a single member of this court. My views respecting the desirability of adhering to an established rule constituted one of the reasons for my dissent in the Cahan and Berger cases. In the situation now confronting me, that same reason would seem to indicate that I should accept the rule established by the majority opinions in those cases.

Furthermore, it is clear from the opinion in the Cahan case, that this court still has before it the difficult task of adopting "workable rules" to supplement the general exclusionary rule. (*People* v. *Cahan, supra,* p. 451.) Numerous cases are now pending here involving the determination of such workable rules. Other pending cases, like the present one, call for a determination of the question of whether the admission of evidence, which should have been excluded

under the exclusionary rule, has resulted in a miscarriage of justice. (Const., art. VI, § 4½.) It appears desirable that all members of this court should participate in the determination of the numerous questions presented by the pending cases, and it further appears that full participation by any member of this court in the determination of many of these important questions will be possible only if such member is willing to accept the exclusionary rule as the established rule. If perchance, either the exclusionary rule itself, or any other rule that this court may adopt to supplement it, should prove unsatisfactory, it is within the province of the Legislature to deal with this important evidentiary problem in such manner as it may deem appropriate.

Edmonds, J., concurred.

TRAYNOR, J.—I dissent.

I would reverse the judgment and order on all counts.

Defendants were convicted of four crimes alleged to be part of an extensive criminal venture whereby Tarantino used threats of exposure by magazine and radio to extort money from his victims. Since the victims were of unsavory character, to convince the jury, it was necessary for the prosecution to substantiate its case by evidence that the victims were telling the truth. It accomplished this purpose by introducing 60 excerpts of illegally obtained recordings of conversations that took place in Tarantino's room. These recordings permeated the prosecution's case, and the record demonstrates that they weighed heavily with the jury in substantiating the testimony of the victims. After the jury had been out for over a day, the jurors reported that they could not agree on any count of the indictment. Thereafter excerpts of the recordings were repeatedly played to them at their request, and not until after four days of deliberation were they able to reach a verdict.

The majority opinion concedes that under these circumstances the admission of the illegally obtained evidence was prejudicial as to three of the counts. It concludes, however, that as to Count 2, no prejudice is shown. It reaches this conclusion on the following grounds: (1) The alleged Vlasoff extortion occurred before the microphone was hidden in Tarantino's room, and there "is no mention in the evidence obtained by the device of the alleged offense against Vlasoff." (2) Vlasoff's testimony is "impressively strength-

ened by the testimony of other witnesses, the victims of Counts 3 and 4 and the victims of extortions not charged against the defendants, showing the pattern of defendant's criminal operations.'' (3) The jury was instructed that ''Each count set forth in the Indictment charges a separate and distinct offense. You must consider the evidence applicable to each alleged offense as though it were the only accusation before you for consideration, and you must state your finding as to each count in a separate verdict; uninfluenced by the mere fact that your verdict as to any other count or counts is in favor of, or against, the defendants. They may be convicted or acquitted upon any or all of the offenses charged, depending upon the evidence and the weight you give to it, under the Court's instruction.'' (4) ''It is to be presumed that the jury obeyed this instruction and was not influenced to return a guilty verdict as to Count 2 upon evidence other than that pertinent to this count.'' When these grounds are viewed in the light of the record they demonstrate that the admission of the illegally obtained evidence was just as prejudicial with respect to the Vlasoff count as it was with respect to the others.

Vlasoff testified that during the pendency of the present proceedings he had been indicted for attempting to steal money by means of fraudulent and marked cards and loaded dice, that he had been a pimp living off the earnings of prostitutes, and that he had been arrested at different times for vagrancy, pimping, gambling, and after-hours sales of liquor. He also admitted committing perjury for $1,000 by signing a false affidavit. Had his testimony stood alone, it is doubtful that it would have convinced the jury of defendants' guilt on Count 2. What other evidence would the jury consider ''pertinent to this count''? It would consider the same evidence that the majority opinion considers relevant to sustain the conviction on Count 2, namely, the evidence ''showing the pattern of defendant's criminal operations,'' evidence that, with respect to crimes not charged, was only admissible because it was relevant as showing ''criminal methods and purposes similar to those shown by the testimony of Vlasoff.'' Inextricably intermixed with the admissible relevant evidence of other crimes was the inadmissible evidence of those crimes provided by the recordings. The jury could not rationally determine whether the testimony of the other victims ''impressively strengthened'' Vlasoff's testimony until it determined whether those victims were telling the truth, and it

would inevitably turn to the recordings in making that determination.

The judgment in this case must stand or fall as a whole. Since all of the offenses charged were part of one pattern of alleged criminal conduct, evidence of each offense was relevant to prove all of the others. The indictment itself listed defendants' conversations with Vlasoff as overt acts of the conspiracy charged in Count 1. In reaching its verdict on Count 2 the jury was not required so to compartmentalize the evidence as to disregard the evidence on the other counts, for the evidence on the other counts, including the illegally obtained evidence, was not only relevant but "pertinent" to Count 2, and indeed, the majority opinion itself relies on the legally obtained evidence on the other counts to affirm the conviction on Count 2. Since the jury was instructed to consider all of the relevant evidence, it cannot be assumed that in reaching its verdict on Count 2 it relied solely on the legally obtained evidence on the other counts to substantiate Vlasoff's testimony and disregarded the illegally obtained evidence on those counts. Nor can it be assumed that it relied on both classes of evidence in reaching its verdict on Counts 1, 3, and 4 but only on legally obtained evidence in reaching its verdict on Count 2. The conclusion is inescapable that if the admission of the illegally obtained evidence was prejudicial as to Counts 1, 3, and 4, it was also prejudicial as to Count 2.

Gibson, C. J., concurred.

CARTER, J.—I dissent.

I am in full accord with the views expressed by Mr. Justice Traynor in his dissenting opinion, and I do not believe it is possible for anyone to say with any degree of sincerity or conviction that the conceded error in the admission of material evidence unlawfully obtained does not permeate the entire record and equally affect the determination of the jury as to Count 2 as well as to the other counts. This must be apparent when we consider the effect of the instruction given by the court to the jury relative to the evidence offered of other similar offenses which the prosecution claims the defendant had committed.* In view of

---

*"Evidence was offered in this case for the purpose of showing that the defendants committed other crimes than the ones of which they are accused, and for which they are on trial in this action. Such evidence was received for a limited purpose only, not to prove distinct offenses

this instruction it must be assumed that the jury considered all of the illegally obtained evidence for whatever bearing "it might have on the question of whether defendants are innocent or guilty of any crime charged against them in this action" and if such illegally obtained evidence tended to show that defendant had a motive for the offense charged against him in Count 2, or that he entertained the intent which is a necessary element of said offense, or that he possessed knowledge that might have been useful in the commission of said offense, or that there existed in his mind a plan, scheme, system or design which fitted into the commission of said offense, or that there existed in his mind a consciousness of guilt, it would be relied upon to establish his guilt of the offense charged in Count 2. Certainly it cannot be said that the tremendous volume of illegally obtained evidence which was offered by the prosecution in this case did not tend to establish some or all of the above mentioned elements of the offense charged in Count 2, and therefore I think it is only fair to assume that the illegally obtained evidence admitted over the objection of defendant weighed heavily with the jury in determining the guilt of the defendant Tarantino of the crime charged in Count 2. In view of this clear and obvious situation I do not think it can fairly be said that the admission of this evidence did not result in a miscarriage of justice as to Count 2 but did result in a miscarriage of justice as to Counts 1, 3 and 4.

Without considering the effect of the above quoted instruction relating to the applicability of the illegally obtained evidence to Count 2, the majority opinion states: "The sixty excerpts of illegally obtained recordings were played re-

---

or continued criminality, but for such bearing, if any, as it might have on the question whether defendants are innocent or guilty of any crime charged against them in this action.

"You are not permitted to consider that evidence for any other purpose, and as to that purpose, you must weigh such evidence as you do all other in the case. You are not permitted to consider that evidence for any other purpose. The value, if any, of such evidence, depends on whether it tends to show, first, that the defendants had a motive for the commission of the offense charged against them in this action, or, second, that the defendants entertained the intent which is a necessary element of the alleged crime for which they are now on trial, as pointed out in these instructions, or, third, that the defendants possessed knowledge that might have been useful in the commission of any crime for which they are now on trial; or, fourth, that there existed in the minds of the defendants a plan, scheme, system or design, into which fitted the commission of the offense for which they are now on trial; or, fifth, that there existed in the minds of the defendants a consciousness of guilt."

peatedly to the court and jury. They contained the names of the complaining witnesses and defendant's recorded remarks connected these names, insofar as Counts 1, 3 and 4 are concerned, with threats and demands for money. Since the recordings clearly constituted a substantial and important part of the evidence pertinent to the last mentioned counts, it cannot be said that the verdicts as to those counts rested on evidence independent of them. (See *Stevens* v. *Snow* (1923), 191 Cal. 58, 67 [214 P. 968].) Accordingly their admission in evidence deprived the defendant of a fair trial and resulted in a miscarriage of justice which necessitates a new trial as to such counts.'' As justification for its holding that the admission of the illegally obtained evidence deprived the defendant of a fair trial and resulted in a miscarriage of justice which necessitates a new trial *as to Counts 1, 3 and 4, but not as to Count 2,* the majority opinion states: ''Independently of the recordings, the effect of Vlasoff's testimony describing the commission of the offense against him is impressively strengthened by the testimony of other witnesses, the victims of Counts 3 and 4 and the victims of extortions not charged against the defendants, showing the pattern of defendant's criminal operations. This admissible evidence of other offenses is of such probative, corroborative effect that the record as a whole, notwithstanding its further content of illegally obtained evidence, falls short of leading us to the opinion that as to this count of the indictment (Count 2), defendant's conviction can be said to constitute a miscarriage of justice. (Cal. Const., art. VI, § 4½.)'' The majority opinion then discusses the effect of the instructions given by the court to the jury with respect to the weighing of the evidence as to each count in the indictment and the determination of the sufficiency of the evidence as to each count independent of the other, and concludes that it must be presumed that the jury followed these instructions. But the majority makes no mention of the instruction hereinabove quoted and the effect such instruction might have in causing the jury to give consideration to the illegally obtained evidence in arriving at their verdict as to Count 2. I am disposed to agree with the majority that it must be presumed that the jury followed the instructions of the court, but in so doing they would be required to give consideration to much if not all of the illegally obtained evidence in their determination of the guilt or innocence of the defendant of the offense charged in Count 2, and therefore if, as the majority hold,

such illegally obtained evidence deprived defendant of a fair trial and resulted in a miscarriage of justice as to Counts 1, 3 and 4, it is inescapable that a fair and honest consideration of the record points unerringly to the same conclusion as to Count 2.

Since the majority here invokes section 4½ of article VI of the Constitution of California as the basis for its holding that the judgment as to Count 2 should be affirmed, I think it might be well to give consideration to the applicability of this provision to the case at bar. In my opinion section 4½ of article VI of the Constitution of California postulates a wise and salutary concept of appellate review in both criminal and civil cases. Its adoption marked a departure from the rigid application of technical rules which had been previously invoked by this court and which had resulted in the reversal of judgments in criminal cases where there was scarcely any doubt as to the guilt of the defendant and it was obvious that form rather than substance was playing too dominant a role in the decisions of our courts. Hence the people saw fit in the adoption of this provision to write into the Constitution the concept that a reviewing court should not reverse a judgment because of a mere technical error which did not go to the merits of the case or could not possibly affect the result and thereby enjoined upon the reviewing court the duty to examine the entire record and determine therefrom whether or not the error complained of had resulted in a miscarriage of justice before ordering a reversal of the judgment. This amendment was adopted about the time that I began the practice of law, and I believed at the time of its adoption and still believe that it constituted a major salutary step in the administration of justice in this state. While this constitutional provision has not been applied with uniformity by our courts, I think the best reasoned cases have uniformly held that it cannot be invoked to cure an error which affects the substantial rights of the litigant, or, in other words, an error which might affect the determination of a material issue in a case. As early as 1913 this court speaking through Mr. Justice Sloss in the case of *People* v. *O'Bryan,* 165 Cal. 55, at pages 65-66 [130 P. 1042], made the following illuminating observations with reference to the application of this section to the review of a judgment of conviction in a criminal case: "This much, however, we think may be safely said. Section 4½ of article VI of our constitution must be given at least the effect of abrogating

the old rule that prejudice is presumed from any error of law. Where error is shown it is the duty of the court to examine the evidence and ascertain from such examination whether the error did or did not in fact work any injury. The mere fact of error does not make out a *prima facie* case for reversal which must be overcome by a clear showing that no injury could have resulted.

"On the other hand, we do not understand that the amendment in question was designed to repeal or abrogate the guaranties accorded persons accused of crime by other parts of the same constitution or to overthrow all statutory rules of procedure and evidence in criminal cases. When we speak of administering 'justice' in criminal cases, under the English or American system of procedure, we mean something more than merely ascertaining whether an accused is or is not guilty. It is an essential part of justice that the question of guilt or innocence shall be determined by an orderly legal procedure, in which the substantial rights belonging to defendants shall be respected. For example, if a court should undertake to deny to a defendant charged with a felony the right of trial by jury, and after a hearing of the evidence render a judgment of conviction, it cannot be doubted that such judgment should be set aside even though there had been the clearest proof of guilt. Or, if a defendant, after having been once acquitted, should be again brought to trial and thereupon convicted, in disregard of his plea that he had been once in jeopardy, it would hardly be suggested that because he was in fact guilty, no 'miscarriage of justice' had occurred."

In *People* v. *Sarazzawski*, 27 Cal.2d 7, 11 [161 P.2d 934], decided in 1945, this court declared: "When a defendant has been denied any essential element of a fair trial or due process, even the broad saving provisions of section 4½ of article VI of our state Constitution cannot remedy the vice and the judgment cannot stand. (*People* v. *Mahoney*, 201 Cal. 618, 627 [258 P. 607]; *People* v. *Adams*, 76 Cal.App. 178, 186-187 [244 P. 106]; *People* v. *Gilliland*, 39 Cal.App.2d 250, 264 [103 P.2d 179]; *People* v. *Duvernay*, 43 Cal.App.2d 823, 829 [111 P.2d 659].) That section was not designed to 'abrogate the guaranties accorded persons accused of crime by other parts of the same constitution or to overthrow all statutory rules of procedure and evidence in criminal cases. When we speak of administering "justice" in criminal cases, under the English or American system of procedure,

we mean something more than merely ascertaining whether an accused is or is not guilty. It is an essential part of justice that the question of guilt or innocence shall be determined by an orderly legal procedure, in which the substantial rights belonging to defendants shall be respected.' (*People* v. *O'Bryan,* 165 Cal. 55, 65 [130 P. 1042], opinion of Mr. Justice Sloss; *People* v. *Wilson,* 23 Cal.App. 513, 524 [138 P. 971].)''

In *People* v. *Hall,* 199 Cal. 451, 458 [249 P. 859], Mr. Justice Shenk, speaking for a unanimous court, said: ''The amendment by which said section 4½ was added to the constitution was not 'designed to repeal or abrogate the guaranties accorded persons accused of crime by other parts of the same constitution, *or to overthrow all statutory rules of procedure and evidence in criminal cases.*' (*People* v. *O'Bryan,* 165 Cal. 55 [130 P. 1042]; *People* v. *Frey,* 165 Cal. 140 [131 P. 127]; *People* v. *Wilson,* 23 Cal.App. 513 [138 P. 971]; *People* v. *Ho Kim You,* 24 Cal.App. 451 [141 P. 950].)'' (Emphasis added.)

In *People* v. *Carmichael,* 198 Cal. 534, 547 [246 P. 62], Mr. Justice Curtis speaking for this court, said: ''No authority has been called to our attention which can be construed as holding that section 4½ of article VI of the constitution can be relied upon to sustain the judgment herein. As we have already said, in our opinion it was prejudicial error for the court to refuse the appellant the right to examine the jurors as to the effect on their minds of the standing of the former jury. The ruling of the court in thus limiting the appellant in his examination of the jurors was, in our opinion, the deprival of the appellant of a fundamental right, —a right to be tried by an impartial jury. It was never intended by this provision of the constitution to take from the defendant in a criminal action his fundamental right to a jury trial or in any substantial manner to abridge this right (*People* v. *Wismer,* 58 Cal.App. 679, 688 [209 P. 259]).''

In *People* v. *Bomar,* 73 Cal.App. 372, 378 [238 P. 758], the court said: ''Neither do we think that section 4½ of article VI of the constitution is applicable in the present case. Before any accused person can be called upon to defend himself on any charge prosecuted by information, he is entitled to a preliminary examination upon said charge, and the judgment of the magistrate before whom such examination is held as to whether the crime for which it is sought to prosecute him has been committed, and whether there is suffi-

cient cause to believe him guilty thereof. These proceedings are essential to confer jurisdiction upon the court before whom he is placed on trial. To say that he was accorded a fair trial upon an information filed against him without a substantial compliance with these jurisdictional requirements, and, therefore, that there had been no miscarriage of justice, hardly meets the situation. Such an argument would apply with equal force to the validity of the conviction upon an information filed by the district attorney in a case where no preliminary examination at all had been held. Such practice would result, in legal effect, in wiping out all provisions of the constitution and the Penal Code providing for preliminary examination, and in clothing the district attorney with unlimited authority to file information against whomsoever in his judgment he might consider guilty of crime. We do not believe that it was ever the intention to extend the scope of section 4½ of article VI of the constitution to any such limits.''

In *People* v. *Salaz*, 66 Cal.App. 173, 185 [225 P. 777], the court said: ''While it is true that section 4½ of article VI of the constitution confers upon this court the power to weigh, to a limited extent, the entire evidence upon which a conviction was had, still 'we are not substituted for the jury. We are not to determine, as an original inquiry, the question of defendant's guilt or innocence.' We are to 'decide whether, in our judgment, any error committed *has led* to the verdict which was reached.' (*People* v. *O'Bryan*, 165 Cal. 55 [130 P. 1042].) (Italics ours.) *And whenever we are unable to determine whether the defendant would have been convicted had erroneously admitted testimony been withheld from the jury's consideration, this section of the constitution cannot be applied to uphold the judgment. (People* v. *MacPhee*, 26 Cal.App. 218 [146 P. 522]. See, also, *People* v. *Columbus*, 49 Cal.App. 763 [194 P. 288], *Freeman* v. *Adams*, 63 Cal.App. 225 [218 P. 600], and *People* v. *Roe*, 189 Cal. 548 [209 P. 560].) After a most careful consideration of the entire cause, including the evidence, we are unable to determine whether the jury would or would not have convicted appellant had Dr. Wagner's opinion as to the position of the parties been withheld from them. This being so, we do not think that the judgment can be upheld by reason of this provision of the constitution.'' (Emphasis added.)

In *People* v. *Abbott*, 132 Cal.App. 109, 114 [22 P.2d 566], the court said: ''Appellant, however, argues that even if

this be true, section 4½ of article VI of the Constitution should rescue the case from the fate of a new trial. _We do not think this constitutional section permits us to consider the evidence of the whole case as a trial tribunal and sustain or reverse every judgment that reaches us upon our own 'verdict.'_ It does not intend to repeal the fundamental rights of trial by judge and jury where witnesses appear and their testimony may be given such weight as their words, conduct and appearance would seem to justify. There is certainly great doubt that the jury disregarded the court and found defendant guilty of one of the offenses excluded by the terms of the court's instructions. It is almost certain it did not. The defendant is entitled to a jury trial on all offenses charged against him before being punished for them and we should not take the chance of depriving him of such right upon unreasonable and strained constructions and presumptions." (Emphasis added.)

The foregoing review of the authorities in this state relating to the application of section 4½, article VI, of the Constitution makes it crystal clear that an error such as the one here under review cannot be cured by the application of this section.

While a majority of this court has recently invoked this section for the purpose of affirming a judgment in a case where the appealing party had been denied the right to a peremptory challenge of a juror, its decision is clearly contrary to all the authorities (see my dissenting opinion in _Buckley_ v. _Chadwick_ filed November 8, 1955, _ante,_ p. 183 at p. 208 [288 P.2d 12]), and it is obvious that this provision was only relied on in that case as some slight justification for the conclusion reached by the majority. In other words the majority desired to affirm the judgment and section 4½ of article VI was invoked even though the error there committed may have deprived the appellant of his right to a fair and impartial jury. No other case has gone this far or even approached it. The effect of such a decision is to permit the majority to resort to section 4½ of article VI as a device which may be used for the affirmance of any judgment regardless of the seriousness of the error committed. In my opinion this is the situation which exists in the case at bar. To state the matter pointedly, it simply amounts to this: A majority of this court desires to affirm the judgment in this case, and section 4½ of article VI of the Constitution is relied upon

to cure any error which may have occurred so far as Count 2 is concerned.

I also agree with appellant that it was prejudicial error to admit in evidence some 200 weekly issues of *Hollywood Life,* a magazine published by defendant, and to permit these magazines to be examined by the jury during their deliberations. While these issues may have contained material evidence in support of the charges against the defendant, they also contained many articles which had no bearing whatsoever upon any of the offenses charged, but may have had the effect of prejudicing the jury against the defendant. These issues contained many articles attacking members of the police department of San Francisco including high officials in said department. They also contained many articles attacking officials and employees of one of the most powerful newspaper syndicates in California. They also contained articles attacking many public officials of San Francisco and California including the present attorney general. None of these articles had any bearing whatsoever upon any of the offenses charged against the defendant. It was therefore error of the most prejudicial character to admit in evidence the complete issues of these magazines and permit the jury to peruse the same.

Defendant may be an undesirable character. His conduct as disclosed by the record is such that it could not help but create resentment, animosity and ill will on behalf of many prominent, influential people. His attacks upon most if not all of these people appear to be wholly unjustified and deserving of condemnation, but the problem before this court in reviewing his conviction of the offenses charged is to determine whether or not he was accorded that fair and impartial trial guaranteed by the Constitution and laws of this state. Even a wicked, disreputable scandalmonger is entitled to a fair trial before he is convicted and punished. In my opinion the admission of the illegally obtained evidence and the issues of the *Hollywood Life* magazine constituted error of such magnitude that a fair and impartial trial was not had. Had this evidence been excluded it is not beyond the realm of probability that a different result may have been reached by the jury. The jury deliberated for five days before arriving at its verdict. This fact makes it obvious that at least some of the jurors were not convinced as to the guilt of the defendant on all of the counts, and it may be that Count 2 was the one regarding which the doubt existed. In this state of the record I am convinced that the only solution which can

be reached by this court which will be consonant with the quality of justice which should be administered by a court of justice, is that the judgment as to all counts should be reversed and the defendant should be granted a new trial.

Appellant's petition for a rehearing was denied December 28, 1955. Gibson, C. J., Carter, J., and Traynor, J., were of the opinion that the petition should be granted.